Filed 2/4/16

# IN THE SUPREME COURT OF CALIFORNIA

| | | |
|---|---|---|
| THE PEOPLE, | ) | |
| | ) | |
| Plaintiff and Respondent, | ) | |
| | ) | S025748 |
| v. | ) | |
| | ) | |
| JOSE LUPERCIO CASARES, | ) | |
| | ) | Tulare County |
| Defendant and Appellant. | ) | Super. Ct. No. 027503 |
| _____ | ) | |

A Tulare County jury convicted defendant Jose Lupercio Casares of the attempted premeditated murder of Alvaro Lopez and the murder of Guadalupe Sanchez. (Pen. Code, §§ 664, 187.)[1] With respect to the murder, the jury found true a lying-in-wait special-circumstance allegation. (§ 190.2, subd. (a)(15).) As to both offenses the jury found defendant personally used a firearm (§§ 1203.06, subd. (a)(1), 1192.7, subd. (c)(8); former § 12022.5); it found not true an allegation he personally inflicted great bodily injury on Lopez (former § 12022.7). The jury also convicted defendant of carrying a concealed firearm (former § 12025, subd. (b)) and possessing cocaine (Health & Saf. Code, § 11350). After a penalty phase, the same jury returned a death verdict. The trial court sentenced

---

[1]    Further statutory references are to the Penal Code unless otherwise specified.

1

defendant to death and stayed imposition of sentence on the noncapital counts. This appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment.

## I. FACTS

### A. Guilt Phase

#### 1. Prosecution's case-in-chief

##### a. Witness testimony

###### 1. Alvaro Lopez

In March 1989, Alvaro Lopez lived in Farmersville with his sister, Hidalia, and her boyfriend, Guadalupe Sanchez. Lopez had become acquainted with defendant while they were in jail. On the afternoon of March 30, 1989, Lopez and Sanchez went to defendant's house on Sweet Street in Visalia, where defendant asked Lopez to obtain three ounces of cocaine for resale. Lopez relied on Sanchez to procure the drug; after he had done so, between 6:00 and 7:00 p.m., the two men returned to defendant's house. Sanchez was driving and Lopez was in the front passenger seat; defendant got in the back seat behind Sanchez and Ruben Contreras sat next to defendant. Neither Sanchez nor Lopez was armed.

The group set off for the purported buyer's house, stopping at a store on Highway 63 next to the Patterson Tract house in Visalia where defendant said the buyer lived. Lopez and Sanchez entered the store and bought two beers while defendant went to the house. When defendant returned to the car, he said the buyer had visitors and they would wait for him up the road. Sanchez continued down the road for a short distance, then pulled over and put the car in park with the motor running. Defendant immediately put a pistol to Sanchez's head, told Contreras to "secure" Lopez, and ordered Sanchez to give him the cocaine. Contreras put a knife to the side of Lopez's neck. Sanchez complied with defendant's demand, handing the drug back over his right shoulder. Defendant

2

then shot Sanchez.[2]  Lopez grabbed Contreras's hand and, feeling Sanchez's head roll onto his shoulder, tried to open the car door.  Lopez heard a second shot which struck him in the left arm.  With Contreras stabbing him, Lopez pushed the car door open with his leg, got out of the car, and fell.  Defendant shot at Lopez, who got up and ran across the road.  A man saw him there and Lopez was taken to the hospital for treatment.  He had sustained 17 knife and gunshot wounds, several of them life threatening, and remained hospitalized for two weeks.

Lopez did not immediately identify defendant as the perpetrator, instead telling detectives two Mexican hitchhikers committed the crimes, because he wanted to exact his own revenge.  His girlfriend Evangelina Avalos visited Lopez at the hospital and told him to tell the truth.  Lopez then asked to speak with detectives and identified defendant from a photo lineup.  For a long time, however, including at the preliminary hearing, he denied drugs were involved in the incident, only disclosing that fact a few months before trial.

---

[2]     After stating defendant shot Sanchez, Lopez testified confusingly that "[h]e grabbed it and pulled"; the prosecutor asked, "Pulled what?"  Lopez answered, "The pistol."  The prosecutor attempted to clarify the testimony by asking, "Are you referring to a particular part of the pistol?"  Lopez responded, "The head."

On cross-examination, defense counsel asked Lopez, "After [Sanchez] handed the drugs back over his shoulder, then what did [Sanchez] do?"  Lopez answered, "Nothing.  He just grabbed it, and with the other hand he pulled."  Counsel asked:  "Okay.  When you say he, you mean [Sanchez] grabbed what?"  Lopez answered:  "When [defendant] grabbed the drug he pulled the gun."  Counsel asked:  "Okay.  [Sanchez] pulled the gun, right?"  Lopez answered:  "[Defendant]."  Counsel:  "[Sanchez] grabbed the gun with his hand, didn't he?"  Lopez:  "No."  Lopez later explained that by saying "he pulled the pistol" he meant defendant "pull[ed] the trigger on the pistol" "to fire."

3

## 2. *Gilbert Galaviz*[3]

In March 1989, Gilbert Galaviz was living on Sweet Street in Visalia with Maria Lupercio Contreras and Alicia Lupercio, Ruben Contreras's sisters. On the 30th of that month, Galaviz testified, defendant, who was staying at the house, and Ruben Contreras came to the house. In the late afternoon, he saw them get into a small beige four-door car. Two other men whom Galaviz did not know were also in the car. The men left and returned about an hour later. Just before dark, about 7:00 or 7:30, Galaviz saw defendant and Contreras leave again in the same car. Contreras was carrying a knife and defendant a gun that Galaviz had seen him cleaning earlier that day. Galaviz recalled defendant was wearing black pants and a hat with a Harley Davidson symbol on it. About 8:30 that evening, defendant and Contreras returned to the Sweet Street house with blood on their clothes. They went to the restroom and began washing up; defendant changed clothes and cleaned a gun. They said they had killed a pig and almost killed another one, but it got away. Defendant offered Galaviz some cocaine.

### b. *Physical evidence*

The body of Guadalupe Sanchez was found lying supine in a residential area, on the south side of Avenue 328 in Visalia; nearby were a bloody knife and two shell casings. Around the palm of his left hand was his watch. The cause of death

---

**3** At the time of his testimony, Galaviz was serving a sentence of 25 years to life for murder in an unrelated case. Galaviz had also been convicted of attempted grand theft in 1982 and two counts of burglary in 1983. He acknowledged that he came forward and contacted police regarding this case after his arrest for petty theft on April 8, 1989, at a time when he was also about to be sentenced on a burglary charge, because he hoped to be released from jail quickly. In fact, after he told police what he knew, he was released on his own recognizance despite a prior failure to appear. He understood that he received a reduced sentence on the pending burglary charge because of his cooperation with police. Galaviz testified his memory was affected by a recent threat to himself or others close to him.

was a single gunshot wound to the head. The bullet entered the back of the head just to the left of the midline and traveled left to right and slightly downward, exiting under the right eye. Powder tattooing around the entry wound and thermal burning of the tissue under the wound indicated that the muzzle of the gun when fired was either touching the skin or within an inch of it.

The car Sanchez had been driving was found the day after the murder, about three blocks from the Sweet Street house where defendant was staying. Blood was on the seats, in the trunk, on the floorboard, side panels, and glove box, and on the exterior on the passenger side and hood. A bullet hole in the windshield originated from inside the car, the shot having been fired from the left side of the driver's headrest.

Detective Eric Grant of the Tulare County Sheriff's Office crime lab processed the car and collected many fingerprints, which were first analyzed by Detective Brian Johnson, who had spent most of his 18-year career in the crime lab. Johnson testified his lab used a standard of eight to 10 points of comparison when calling a match between a latent print and a known set of prints; he personally liked to see 10 to 12 matching points, but acknowledged that some labs consider fewer than eight points to be sufficient. Johnson determined that none of the fingerprints submitted to him matched those of Maria Lopez [*sic*; possibly Maria Contreras, a resident of the Sweet Street house, or Maria Vasquez, a girlfriend of Alvaro Lopez], Lopez's sister Hidalia, Evangelina Avalos, or Gilbert Galaviz, but three of the prints matched Ruben Contreras's. Johnson and his supervisor were unable to make a comparison of two prints, one made in blood and taken from the driver's side rear seat and one left on the passenger's side trunk.

All of the prints Grant obtained were eventually sent to the state Department of Justice's Fresno Regional Laboratory for further analysis. Richard Kinney, a

5

latent print analyst at the Fresno lab, confirmed the matches Johnson and his supervisor had made, as well as the exclusions. In addition, Kinney found the bloody print on the rear seat had the same ridge characteristics and placement as defendant's known print, based on more than 10 matching characteristics. He also determined that the print lifted from the trunk matched defendant's palm print, based on at least 10 matching characteristics.

### c. Defendant's arrest; murder weapon

Defendant was arrested on April 8, 1989, outside a residence in the 100 block of Strawberry Street. After an officer forced him to the ground, a handgun later determined to be the murder weapon was found underneath him. The gun did not possess a "hair trigger"; it required from nine to 15 pounds of pressure to fire. Two small packages of cocaine were found in a pocket of the jacket defendant was wearing at the time of his arrest.

### d. Additional evidence of Lopez's drug dealings

In 1989, Gracie Mendez was living with cocaine dealer Abundio Burciaga and knew Alvaro Lopez and Guadalupe Sanchez, who was Burciaga's cousin. Lopez worked for Burciaga for at least two years before Sanchez's murder, and continued to sell drugs for a year thereafter. Burciaga would go to Los Angeles weekly to buy four to five thousand dollars' worth of cocaine, and Lopez often went with him. Lopez would also buy drugs in Los Angeles for Burciaga and bring them back. Burciaga ultimately fired Lopez for stealing from him. On March 30, 1989, Mendez testified, Lopez and Sanchez came to Burciaga's house and Burciaga gave them a brown bag with about five thousand dollars in it.

After hearing that Sanchez had been killed, Burciaga had two conversations with Mendez concerning the killing. In one, he told her he had intended for Lopez

6

to be killed; in the other, he said "they" had meant for Lopez to be killed, referring to a man called "El Capitan."

### 2. Defense case

#### a. Alibi evidence

The defense sought to show that defendant was at an apartment on Strawberry Street at the time the murder was committed.

Defendant's cousin Antonio Navarro Lupercio testified that, on March 30, 1989, he went to the Strawberry Street apartment and saw defendant and Contreras playing cards about 2:00 p.m. Antonio saw defendant drink a beer and heard him mention he had a court date on the 31st. Defendant was still there when Antonio left about 6:00 p.m. On cross-examination, Antonio admitted he was unsure on what date he made these observations, although he was sure defendant said he had a court date on the 31st. He also acknowledged being uncertain about the time of his visit, and that he had previously testified he arrived at 4:30 and left at 7:30.

Defendant's cousin Ambrosia Martinez testified she was at the Strawberry Street apartment on March 30, 1989, and saw defendant there around 6:00 or 6:30 p.m.; he told her he had to go to court the following day. On cross-examination, she admitted she was unsure about the date and whether it was defendant or someone else who said defendant had to go to court.

Defendant's friend Guadalupe Medina testified he went to the Strawberry Street residence and saw defendant there almost every day. Medina recalled telling an officer that on one occasion, about 5:30 or 6:00 p.m., defendant declined a beer because he said he had to go to court the next day. Medina could not recall the exact date when this happened, and could not recall when defendant left the residence on that occasion.

7

Delia Contreras, the mother of two of defendant's children and the sister of Ruben Contreras, Maria Lupercio Contreras, and Alicia Lupercio, testified she drove defendant and Ruben to court on March 31, 1989, picking them up at the Sweet Street residence about 7:00 a.m. She also testified that, the night before she took them to court, she drove by the Strawberry Street residence about 6:00 or 7:00 p.m. and saw defendant there.

The parties stipulated that on March 31, 1989, defendant made an appearance on the morning calendar in the Visalia Municipal Court.

### b. Gilbert Galaviz

The defense also sought to show that Gilbert Galaviz, not defendant, committed the murder with Ruben Contreras.

Maria Susie Contreras, Ruben Contreras's sister, was found to be unavailable to testify at defendant's trial; her testimony at defendant's preliminary hearing and Ruben Contreras's trial was read to the jury. In that testimony, Maria stated that in March 1989 she was living on Sweet Street with her sister Alicia Lupercio, Alicia's children, her brother-in-law Manuel Lupercio, and her boyfriend, Galaviz. Defendant also stayed at the residence "off and on." On March 30 of that year, she went to a shopping mall about 3:00 p.m. and returned at 9:00 p.m., entering the house through the back door and going directly to her room and to bed. Alicia and her children were in the house; Maria did not know who else was present. Maria slept through the night and was therefore unaware of what may have happened in the house, but believed Galaviz was absent because she would have had to get up and let him in. The next morning, Maria did not see defendant or Ruben. Galaviz returned home sometime after 10:00 a.m. He was carrying his shirt, his pants were stained and dirty, and there was blood on his clothing. When Maria asked him what happened, he at first said, "Nothing"; when she repeated the

8

question, he "came out real smart and said, 'I killed a pig.' " She offered to wash the clothes, but Galaviz told her instead to get rid of them and to burn them. When she persisted, telling him he could wear the clothes to work, he again insisted she get rid of them. Eventually he took the clothes and she never saw them again. About a week later, Maria learned Ruben had been arrested for the murder of Sanchez and the attempted murder of Lopez. Although she had seen blood on Galaviz's clothes, she did not think he was involved because he had previously gotten into fights and come home in the same condition. During the time she lived with Galaviz, she saw him with a black gun with a clip. She last saw the gun in a box in which he kept his clothes. Galaviz told her he sold the gun to defendant on April 1.

Delia Contreras testified that when she arrived at the Sweet Street residence on the morning of March 31 to take defendant and Ruben to court, the two were sleeping in the living room, and Alicia and her children were in one of the two bedrooms. She did not recall seeing Galaviz at the residence at that time. In late February 1989, she had seen Galaviz in possession of a gun that was generally the same color and shape as the one found in defendant's possession at the time of his arrest. About two days before March 30 of that year, she saw a gun in a box of clothes in the bedroom her sister and Galaviz shared in the Sweet Street residence.

Called to the witness stand, Alicia Lupercio repeatedly said she could not remember the events of March 30, 1989. But when Detective Pinon interviewed Alicia on May 6, 1989, she had told him that on March 30 defendant, her brother Ruben, and Galaviz were at her home on Sweet Street; defendant and Ruben left at 4:00 p.m., but she did not see whom they left with; Galaviz stayed and worked on a car; and defendant and Ruben did not return until about 10:00 p.m. Alicia did not recall what they were wearing when they returned or whether they had blood on their clothing, and she had never seen defendant or Galaviz with a gun.

9

Severa de la Rosa was close friends with Ruben Contreras's mother and a cousin of Estella Lopez Galaviz[4] and Lolly Lopez. She also knew Galaviz well; he had lived with her family until his marriage to her niece, with whom he had had a child. De la Rosa testified that on April 1, 1989, she saw Galaviz and another man in a small beige truck at a Circle K convenience store in Visalia. Galaviz tried to sell her a gun and some rings. It was "usual" for him to have a gun in his possession. A defense investigator showed her a catalog of guns, from which she picked out a black nine-millimeter gun as looking similar to the one Galaviz had.

Lolly Lopez, the sister of Estella Lopez Galaviz and Maria Vasquez, testified that, several months after the crime, Gilbert Galaviz told her he was sitting in the back seat of a car in Visalia when "Alejandra's son" shot a man in the back of the head. She later learned the man was Ruben Contreras. Galaviz indicated drugs and money were involved.

Joann Galaviz, Gilbert Galaviz's sister, denied telling Defense Investigator Wells that in September 1989 she heard a woman named Helen fighting with Gilbert about an occasion when he shot a man in Visalia. Joann testified she had been confused; she had actually heard Gilbert and Helen talking about a different murder that Gilbert committed in Shafter. Wells testified, to the contrary, that Joann was not confused when he spoke with her about a murder in Visalia.

### 3. Prosecution's rebuttal

The prosecution re-called Galaviz, who denied accusations raised in the defense case. He testified he never had a close relationship with Lolly Lopez and never had a conversation with her about being involved in a murder that took place in March 1989, when Ruben Contreras shot a man in Patterson Tract. He did not

---

[4]  Estella Lopez Galaviz had previously gone by the name Helen Lopez.

see Severa de la Rosa in Visalia shortly after Sanchez's murder and did not try to sell her a gun or a ring about that time. Although he sometimes visited his sister Joann in Bakersfield, and sometimes took women there with him, he did not recall if he ever took Estella Galaviz and did not recall having an argument with Estella there about a killing that took place in either Tulare or Kern County; he never told Estella anything about a killing by defendant or Contreras. Estella testified, consistently, that Galaviz never told her about a killing that occurred on March 30, 1989, in Patterson Tract; rather, he told her about a killing in Shafter.

## B. Penalty Phase

### 1. Aggravating evidence

#### a. August 8, 1979, shooting at occupied vehicle

Sometime after midnight on August 8, 1979, City of Tulare Police Officer Rush Mayberry was parked at the intersection of Pratt Street and Inyo Avenue across from a well-lit shopping center. Two cars were parked in the lot and a white car was moving through it. Defendant was standing near one of the parked cars and, when the white car passed the two parked cars, he retrieved a .22-caliber Remington rifle from the back seat of one of the parked vehicles. He then went to the rear of one of the cars and, from a distance of about 50 feet, fired twice at the white car. One shot left a dent in the lower part of the car's trunk; the other put a dent in the corner of the bumper. Mayberry responded to the scene and detained defendant and two others. From the back seat of the car Mayberry retrieved the rifle, which was loaded with two rounds in the magazine and one round in the chamber. Defendant, who said he had been drinking that evening, told detectives the car had driven by three times, and the occupants had used racial slurs and threatened him with bodily harm. At one point, defendant said, one of the occupants got out of the vehicle, walked up to him, and said they had a gun and

11

could kill him; at no point, however, did the occupants brandish a gun, and defendant never saw one. On the car's third pass, one of the occupants motioned him over, and defendant assumed they wanted a confrontation. Defendant then shot at the vehicle, intending only to hit the tires.

### b. *November 26, 1980, Boas Minnow Farm robbery*

On November 26, 1980, Paula Estes was working at Boas Minnow Farm when two Hispanic men entered the store and looked around, saying they were interested in buying handguns. A third Hispanic man then walked in, pulled a ski mask over his face and, at gunpoint, told Estes to lie down on the floor. Estes complied and was blindfolded and tied up with her hands behind her back. The robbers took guns out of the display case and off the rack and stole about $200 before fleeing in an old station wagon.

In November 1980, Delia Contreras owned a green station wagon. She did not recall who had the vehicle on the morning of November 26. When asked if she told Detective Diaz that defendant, her common-law husband, and others were at her trailer and left in the green station wagon at 7:00 a.m., she said that she did not know, they "just took off," and she did not see where they went, but that they might have left in the station wagon.

### c. *August 23, 1984, possession of handgun at Arrow Motel*

On August 23, 1984, Visalia Police Department narcotics agent Rory Vadnais and other officers went to the Arrow Motel in Goshen, where they made contact with defendant. Vadnais noticed a bulge that appeared to be the outline of a handgun in defendant's right front pants pocket. Defendant was arrested and found to be in possession of a loaded .22-caliber revolver.

12

### d. February 19, 1987, possession of handgun at Strawberry Street

On February 19, 1987, police made contact with defendant at an apartment located on Strawberry Street in Visalia. A police officer searched defendant's person and recovered car keys from his jacket pocket. The officer had several times previously seen defendant sitting in the driver's seat of a 1974 Monte Carlo parked in front of the apartment building. Police determined that the keys fit the Monte Carlo and found a two-shot .45-caliber derringer under the driver's seat.

### e. March 16, 1989, possession of handgun at Circle K

On the night of March 16, 1989, Officer Michael Stow of the Visalia Police Department saw a van parked at the Circle K convenience store on Old Dinuba Road. Officer Stowe pulled in behind the vehicle and approached defendant, the only occupant, who was seated in the driver's seat. He asked defendant for identification and defendant orally identified himself. Defendant told Stowe the van did not belong to him. Stowe searched the vehicle for documentary identification and found a loaded gun and ammunition on the floorboard to the right side of the driver's seat.

### f. Sexual assaults on Rosa B.

Rosa B. testified that when she was 12 years old she lived on a ranch in the Mexican state of Michoacan. Her ranch was relatively close to the ranch where defendant lived with his family, only about two hours' walk away. The families were on friendly terms; her parents were defendant's godparents. Defendant's father came to Rosa's house and told her several times she was going to be his daughter-in-law. Defendant visited her to ask her to be his girlfriend. When she declined, he did not seem angry. One night about two months later, defendant and six members of his family, some of them armed, came to the house where Rosa was staying and forcibly took her to their ranch, where she was held for about five months. At first she was kept in a banana orchard; then she was taken to their

13

house. Defendant raped her many times, always at his father's command. Several times Rosa heard defendant's father threaten to kill him. Defendant did not have to use force; Rosa submitted because his father ordered her to do so. One morning about five months after her abduction, Rosa's brother rescued her, shooting and killing defendant's father.

### g. *Prior felony convictions*

Defendant pleaded guilty to one count of robbery in connection with the Boas Minnow Farm incident. In another case he was convicted of one count of possession of narcotics for sale.

### 2. *Mitigating evidence*

### a. *Physical and mental abuse by defendant's father*

Defendant's younger sister Maria Delores (Lola) Lupercio Casares testified their father physically abused all the members of their family, including defendant. He beat their mother on a daily basis and would hang her by a rope over a ceiling rafter until she passed out. Defendant was present and witnessed these episodes of abuse. When Rosa was brought to live with defendant's family, Lola saw defendant's father order defendant to "make her his," in other words, to rape her. Once when defendant could not perform sexually, the father belittled him, saying "You're not a man, you're good for nothing." The father also sometimes beat defendant.

Defendant's cousin Antonio Navarro Lupercio testified he lived near defendant during their childhood and saw him on a daily basis. Antonio saw defendant's father beat him unconscious, and saw the father abuse all members of the household. Defendant was "very much" afraid of his father.

Defendant's uncle Alfredo Navarro testified that when defendant was a child he saw defendant's father beat him with pieces of wood or whatever he could find, and defendant appeared to be very frightened of his father.

### b. Testimony by Richard A. Blak, Ph.D.

Psychologist Richard A. Blak, Ph.D., interviewed defendant, administered psychological tests, and reviewed documents provided by defense counsel. Blak testified defendant had suffered from dysthymia, a type of chronic depression, and generalized anxiety reaction since childhood as a result of severe abuse and victimization by his father. Defendant's intellectual functioning was in the borderline to very low average range. Defendant also suffered from avoidant, obsessive-compulsive, and antisocial personality disorders and abused alcohol and drugs as an adult. These conditions existed at the time of the capital crime and impaired defendant's capacity to appreciate the quality of his actions.

## II. DISCUSSION

### A. Guilt Phase Issues

#### 1. Sufficiency of evidence of first degree murder and lying-in-wait special circumstance

##### a. Standard of review

Defendant contends that the prosecution adduced insufficient evidence to support the first degree murder conviction on the sole theory submitted to the jury, that of premeditation and deliberation, and that the trial court therefore erred in instructing the jury on this theory. He also contends the evidence was insufficient to support the jury's true finding on the lying-in-wait special-circumstance allegation and that the trial court erred in denying his motion under section 1118.1 to dismiss the allegation at the close of the prosecution's case.

15

"When a defendant challenges the sufficiency of the evidence, ' "[t]he court must review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Clark* (2011) 52 Cal.4th 856, 942–943 (*Clark*).) "The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence." (*People v. Bean* (1988) 46 Cal.3d 919, 932.) "Although a jury must acquit if it finds the evidence susceptible of a reasonable interpretation favoring innocence, it is the jury rather than the reviewing court that weighs the evidence, resolves conflicting inferences and determines whether the People have established guilt beyond a reasonable doubt." (*People v. Yeoman* (2003) 31 Cal.4th 93, 128.) " ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " (*Bean*, at p. 933*; see People v. Jones* (2013) 57 Cal.4th 899, 961 (*Jones*).) We apply the same principles in reviewing the sufficiency of the evidence to support a special circumstance finding. (*People v. Brady* (2010) 50 Cal.4th 547, 563, fn. 8.)

### b. First degree murder

"A verdict of deliberate and premeditated first degree murder requires more than a showing of intent to kill. (§ 189 ['willful, deliberate and premeditated killing' as first degree murder].) 'Deliberation' refers to careful weighing of considerations in forming a course of action; 'premeditation' means thought over in advance. (*People v. Bender* (1945) 27 Cal.2d 164, 183; *People v. Thomas* (1945) 25 Cal.2d 880, 900; see *People v. Perez* (1992) 2 Cal.4th 1117, 1123–1124 . . . .") (*People v. Koontz* (2002) 27 Cal.4th 1041, 1080.) " ' "The true test is

16

not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly. . . .” ’ ”  (*Ibid.*)

In *People v. Anderson* (1968) 70 Cal.2d 15, 26–27 (*Anderson*), this court identified “three factors commonly present in cases of premeditated murder: ‘(1) [F]acts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing—what may be characterized as “planning” activity; (2) facts about the defendant’s *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a “motive” to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of “a pre-existing reflection” and “careful thought and weighing of considerations” rather than “mere unconsidered or rash impulse hastily executed” [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a “preconceived design” to take his victim’s life in a particular way for a “reason” which the jury can reasonably infer from facts of type (1) or (2).’ ” (*People v. Koontz*, *supra*, 27 Cal.4th at p. 1081.)  “As we have cautioned, however, ‘[u]nreflective reliance on *Anderson* for a definition of premeditation is inappropriate.  The *Anderson* analysis was intended as a framework to assist reviewing courts in assessing whether the evidence supports an inference that the killing resulted from preexisting reflection and weighing of considerations.  It did not refashion the elements of first degree murder or alter the substantive law of murder in any way.’  [Citation.]  In other words, the *Anderson* guidelines are descriptive, not normative.”  (*Ibid*.)

Here, viewed in the light most favorable to the judgment (*People v. Panah* (2005) 35 Cal.4th 395, 487), the evidence showed that on March 30, 1989, defendant asked Alvaro Lopez to procure three ounces of cocaine for sale to an unnamed buyer. Before meeting up with Lopez and murder victim Guadalupe Sanchez to consummate the deal, defendant was seen cleaning a gun, with which he armed himself before he and his confederate, Contreras—carrying a knife—got into the victims' car. Neither Sanchez nor Lopez was armed. Defendant positioned himself behind Sanchez, who was driving; Contreras, behind Lopez on the passenger side. After driving to a store on Highway 63 next to a house where defendant said the buyer lived, defendant went up to the purported buyer's house while Sanchez and Lopez bought a beer at the store. Returning to the car, defendant told the victims the buyer had visitors and would meet them up ahead. Sanchez continued down the road for a short distance, pulled over, and put the car in park with the motor running. Defendant immediately put a pistol to Sanchez's head, ordered Contreras to "secure" Lopez, and demanded the cocaine. Sanchez complied, defendant shot him, and Contreras began stabbing Lopez, who tried to open the car door. Defendant fired a shot that struck Lopez in the arm. With Contreras stabbing him, Lopez managed to push the car door open with his leg, got out of the car, and fell. Defendant shot at him again; Lopez got up and ran across the road.

This evidence permitted a rational jury to find that defendant formed a plan to rob and kill Sanchez and Lopez with Contreras's assistance, preparing ahead of time to execute the plan by cleaning his gun and arming himself with it. The method by which defendant killed Sanchez (a gunshot to the back of the head at very close range) was sufficiently particular and exacting to support the inference he intentionally killed him according to a preconceived design. (*People v. Romero* (2008) 44 Cal.4th 386, 401 (*Romero*).)

18

Defendant contends the record contains no substantial evidence of planning activity, motive to kill, or an exacting method of execution. Rather, he urges, the evidence reveals a rash, impulsive act that occurred in a struggle over the gun. He argues the prosecution's argument invited the jury to speculate, i.e., to "start out by assuming" that defendant planned to kill Sanchez and Lopez and work from that assumption to infer that the motive for the plan was to take their vehicle as a getaway car without the risk of their reporting the theft to law enforcement. In the prosecution's scenario, defendant had the victims drive to a residential area rather than some remote location so as to avoid arousing their suspicion. Defendant ridicules the prosecutor's interpretation of the facts to show motive or preconceived plan, arguing that because drug dealers like Sanchez and Lopez would never have reported to law enforcement having been robbed of drugs and their car during a drug transaction, defendant could have had no motive to kill Sanchez and Lopez. Instead, he asserts, the circumstances of the crime suggest an unconsidered, impulsive killing.[5] He contends no substantial evidence supports the prosecution's theory that the purported buyer of the cocaine was a ruse, further undermining the prosecutor's theory that the killing was part of a preconceived plan. In support, defendant points to Lopez's testimony that "he pulled the pistol" (see *ante*, fn. 2), which he contends suggests Sanchez was shot when he tried to wrest the gun from the shooter's hand. Finally, defendant argues, the record

---

**5** In arguing the insufficiency of the evidence to show planning activity, defendant also relies on the fact the trial court dismissed, on collateral estoppel grounds, a count alleging conspiracy to commit murder because the jury in Contreras's trial acquitted him of conspiracy to commit murder and found a lying-in-wait special-circumstance allegation not true. But the circumstance that Contreras's jury was not convinced beyond a reasonable doubt that *Contreras* engaged in concerted action does not undermine the findings of the jury in this case that *defendant* premeditated Sanchez's killing.

contains insufficient evidence of a manner of killing so "particular and exacting" as to support an inference "defendant must have intentionally killed according to a 'preconceived design' to take his victim's life." (*Anderson*, *supra*, 70 Cal.2d at p. 27.) Rather, he contends, the evidence—specifically, Lopez's testimony regarding "pull the pistol," the gunshot residue on the driver's headrest, and the fact Sanchez's wristwatch was pulled up on his palm when his body was found—reflects that the shooting occurred during a struggle over the gun.

We are unpersuaded. That the location of the killing was not ideal does not negate an inference that it was planned. Although the prosecutor inartfully asked the jury to "assume" defendant planned to kill the victims, in context he was essentially arguing the evidence logically fit such a theory of the case and inviting the jury to interpret it similarly, as he was entitled to do. The prosecution's theory, that the purported buyer was a ruse, was not an element of the crime required to be supported by substantial evidence but was rather an inference that the jury was free to draw or reject and which found support in the circumstances that no buyer ever actually appeared and, that after a short drive down the road, defendant immediately carried out the robbery and execution-style murder of Sanchez. Despite Lopez's confusing initial testimony about "pull[ing] the pistol," on cross-examination Lopez clarified that defendant shot Sanchez immediately after demanding and receiving the cocaine and there was no struggle over the gun. In this connection, forensic scientist Gary Cortner's testimony the murder weapon did not have a hair trigger, but required nine to 15 pounds of force to fire, is significant. Although the fact Sanchez's watch was pulled up onto his palm when his body was found could support an inference the killing occurred in the course of a struggle, no testimony established how the watch came to be in that position and, as the Attorney General suggests, the jury could equally well have inferred it happened when Sanchez was dragged out of the car. Assuming, as defendant

20

posits, the attack on Lopez was "chaotic," this merely reflects the surviving victim's effort to escape the deadly threat and does not undermine the inference of premeditation and deliberation flowing from the manner in which defendant killed Sanchez.

Essentially, defendant argues competing inferences he wishes the jury had drawn, but substantial evidence supports the jury's decision that his shooting of Sanchez during a purported drug deal was the product of premeditation and deliberation. Defendant's claim of insufficient evidence, together with his derivative due process argument, therefore fails.

### c. *Special circumstance*

At the time of defendant's crime, the special circumstance of murder while lying in wait (former § 190.2, subd. (a)(15)) required "an intentional murder, committed under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage." (*People v. Morales* (1989) 48 Cal.3d 527, 557 (*Morales*).) "The element of concealment is satisfied by a showing ' "that a defendant's true intent and purpose were concealed by his actions or conduct. It is not required that he be literally concealed from view before he attacks the victim." ' " (*People v. Sims* (1993) 5 Cal.4th 405, 432–433 (*Sims*); see *People v. Moon* (2005) 37 Cal.4th 1, 22 (*Moon*).) "As for the watching and waiting element, the purpose of this requirement 'is to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse. [Citation.] This period need not continue for any particular length " 'of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation.' " ' " (*People v. Mendoza* (2011) 52 Cal.4th 1056, 1073 (*Mendoza*).) Defendant contends his case

21

is "qualitatively different" from others in which this court has upheld lying-in-wait special-circumstance findings, in that the evidence of premeditation and deliberation was weak, the evidence failed to show that the concealment of purpose was murderous, the "legally relevant" period of watching and waiting occurred in a few seconds, and the victim was not surprised by the attack. These shortcomings, he contends, dictate reversal of the special-circumstance finding.

At the close of the prosecution's case at the guilt phase the defense moved under section 1118.1 to strike the special circumstance for insufficient evidence. In denying the motion, the court reasoned the fact defendant and Contreras armed themselves before meeting with the victims supported an inference they intended to rob or kill them; their concealment of their weapons and acting in concert to rob and kill the victims reflected a plan to carry out their criminal act at an opportune time and place; their sitting in the back seat gave them a position of advantage that facilitated their surprise attack, and they concealed their purpose from the victims until defendant held a gun to Sanchez's head and demanded the cocaine, which occurred only after the car had been driven several miles and made two stops. Finally, the court found support for a conclusion the murder occurred immediately after the period of watching and waiting, in that defendant shot Sanchez immediately after Sanchez complied with defendant's demand for the cocaine, in "a continuous and unbroken plan to wait, watch, rob and kill."

Defendant takes issue with the conclusion that sufficient evidence supported the elements of the special circumstance in this case. (His further challenge to the jury instructions on the lying-in-wait special circumstance are discussed *post*, in pt. II.A.4.) He first urges there was insufficient evidence he concealed a murderous purpose. Unlike in several other lying-in-wait special-circumstance cases, he notes, such a purpose was not established by the admission of evidence of other similar crimes reflecting a murderous purpose. (E.g., *People v. Carpenter*

22

(1997) 15 Cal.4th 312, 378, 389 (*Carpenter*) [uncharged rape murders]; *People v. Stevens* (2007) 41 Cal.4th 182, 187–189 (*Stevens*) [nonfatal freeway shooting occurring shortly after fatal shooting]; *Moon*, *supra*, 37 Cal.4th at pp. 22–23 [second lying-in-wait murder shortly after, and in same manner, as first lying-in-wait murder].)  Nor was there in this case, as in *People v. Jurado* (2006) 38 Cal.4th 72, 82–88 (*Jurado*), *People v. Hillhouse* (2002) 27 Cal.4th 469, 480–481 (*Hillhouse*), and other cases defendant cites, evidence of a preannounced intention to kill the victim.  Defendant points to no authority, however, holding evidence of other similar crimes or a preannounced intent to kill is necessary to establish the special circumstance.  "When we decide issues of sufficiency of evidence, comparison with other cases is of limited utility, since each case necessarily depends on its own facts." (*People v. Thomas* (1992) 2 Cal.4th 489, 516.)  Here, as the trial court reasoned, evidence that defendant and Contreras armed themselves before getting into the victims' car, concealed the weapons they were carrying, employed an apparent ruse to obviate suspicion, took concerted action once defendant demanded the cocaine from Sanchez, and did so only after Sanchez had driven several miles and made two stops, all reasonably supported an inference defendant and Contreras concealed a murderous purpose from the victims.  That they also entertained an intent to rob the victims does not exclude an intent to kill.

Defendant further contends the evidence failed to show a substantial period of watchful waiting for an opportune time to attack.  In his view, the period of waiting and watching was interrupted when defendant and Contreras left the victims and went to a nearby house while the victims went to a store and bought and drank beer, and resumed only when defendant and Contreras rejoined the victims in the car.  Any arguable period of watching and waiting before the killing, which occurred mere seconds thereafter, he argues, was too insubstantial to satisfy

23

the requirement of the lying-in-wait special circumstance. We disagree. "A killer need not view his intended victim during the entire period of watching and waiting." (*People v. Edwards* (1991) 54 Cal.3d 787, 825 (*Edwards*).) The purpose of the "watchful waiting" requirement—" 'to distinguish those cases in which a defendant acts insidiously from those in which he acts out of rash impulse' " (*Mendoza*, *supra*, 52 Cal.4th at p. 1073)—is satisfied here despite the circumstance that the victims were out of defendant's sight for a few moments. If the jury accepted the prosecutor's "ruse" theory, it could reasonably have concluded that nothing occurred during that interval to indicate either an abandonment of the plan, an alteration in defendant's purpose, or a dawning awareness of that purpose on the victims' part.

In sum, the evidence showing that defendant directed Sanchez to drive up the road to wait for the purported drug buyer and then—once Sanchez stopped the car—immediately and in an unbroken sequence of events put his gun to Sanchez's head, robbed him of the cocaine, and shot him from the back seat of the car, together supported the jury's finding that defendant mounted a surprise attack on Sanchez after a substantial period of watchful waiting for an opportune time to attack. Defendant's challenge to the sufficiency of the evidence of the lying-in-wait special-circumstance allegation therefore lacks merit.

### 2. *Restriction on cross-examination of Gilbert Galaviz*

Gilbert Galaviz testified that defendant and Ruben Contreras left the Sweet Street house on the day of the murder and got into Sanchez's car armed with a gun and a knife, respectively. When they returned, according to Galaviz, they had blood on their clothes; asked what had happened, defendant said, " 'We killed a pig.' " At the time of trial, Galaviz was serving a 25-years-to-life sentence for murder. On cross-examination, defense counsel asked Galaviz if he used a knife

24

to commit the murder of which he was convicted. The trial court sustained the prosecutor's objection on the ground the facts underlying the conviction were irrelevant. Defendant contends the trial court erred in so ruling, and that the error denied him his federal and state constitutional rights to confrontation, to present a defense, to a fair trial, to due process of law, and to a reliable determination of guilt and penalty. (U.S. Const., 6th, 8th, & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16.)

" '[T]he exposure of a witness' motivation in testifying is a proper and important function of the constitutionally protected right of cross-examination.' " (*Delaware v. Van Arsdall* (1986) 475 U.S. 673, 678–679, quoting *Davis v. Alaska* (1974) 415 U.S. 308, 316–317.) "It does not follow, [however], that the Confrontation Clause of the Sixth Amendment prevents a trial judge from imposing any limits on defense counsel's inquiry into the potential bias of a prosecution witness." (475 U.S. at p. 679, citing *Delaware v. Fensterer* (1985) 474 U.S. 15, 20.) " '[T]rial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant.' " (*People v. Williams* (1997) 16 Cal.4th 153, 208.) The " ' "[a]pplication of the ordinary rules of evidence generally does not impermissibly infringe on a capital defendant's constitutional rights." ' " (*People v. Eubanks* (2011) 53 Cal.4th 110, 143.)

Under California law, the right to cross-examine or impeach the credibility of a witness concerning a felony conviction does not extend to the facts underlying the offense. (*People v. McClellan* (1969) 71 Cal.2d 793, 809; *People v. Heckathorne* (1988) 202 Cal.App.3d 458, 462; see Evid. Code, § 786 [evidence of traits of character other than honesty or veracity, or their opposites, is inadmissible

25

to support or attack a witness's credibility].) Defendant contends he should have been allowed to elicit from Galaviz the fact he used a knife in another homicide because its relevance extended beyond the witness's credibility, in that it tended to show Galaviz, not defendant, perpetrated the offenses in this case, inasmuch as one of the victims was stabbed with a knife. Defendant forfeited the point by not advancing it at trial (*People v. Pearson* (2013) 56 Cal.4th 393, 470, fn. 10; Evid. Code, § 354), and it lacks merit in any event. "A criminal defendant may introduce evidence of third party culpability if such evidence raises a reasonable doubt as to his guilt, but the evidence must consist of direct or circumstantial evidence that links the third person to the crime. It is not enough that another person has the motive or opportunity to commit it." (*People v. Abilez* (2007) 41 Cal.4th 472, 517.) That Galaviz had used a knife on a prior unrelated occasion hardly linked him to the commission of the present crimes. Accordingly, the trial court did not abuse its discretion in excluding the evidence. Moreover, defendant suffered no prejudice. Defense counsel elicited from two other witnesses— Galaviz's sister, Joann, and investigator Dan Wells—the fact Galaviz had committed a knife murder. The court's ruling did not deprive defendant of his right to present a defense.

### 3. Instructions assertedly undermining requirement of proof beyond a reasonable doubt

The trial court instructed the jury with various standard instructions (CALJIC Nos. 2.01, 2.21.2, 2.22, 2.27, 2.51, and 8.20) on how to consider and weigh the evidence. Defendant contends these instructions undermined the requirement of proof beyond a reasonable doubt, requiring reversal of the judgment. We reach the merits of the claim despite defendant's failure to object to any of the instructions below (§ 1259; *Clark*, *supra*, 52 Cal.4th at p. 957, fn. 31), examining whether there is a reasonable likelihood the jury understood the

26

instructions in the way defendant asserts (*People v. Solomon* (2010) 49 Cal.4th 792, 822).

As defendant acknowledges, we have rejected his arguments in prior cases. Because defendant advances no persuasive reason to depart from our precedents, we adhere to them here. Thus, CALJIC No. 2.01 (concerning the sufficiency of circumstantial evidence) did not compel the jury to find defendant guilty and the special circumstance true using a standard lower than proof beyond a reasonable doubt. (*Jones*, *supra*, 57 Cal.4th at p. 972.) Nor did it create an impermissible mandatory presumption by requiring the jury to draw an incriminatory inference whenever such an inference appeared "reasonable" unless the defense rebutted it by producing a reasonable exculpatory interpretation. (*People v. Thomas* (2012) 53 Cal.4th 771, 812; *People v. Brasure* (2008) 42 Cal.4th 1037, 1058–1059.) Similarly, CALJIC Nos. 2.21.2 (a witness's willfully false testimony), 2.22 (weighing conflicting testimony), 2.27 (sufficiency of the testimony of a single witness to prove a fact), and 8.20 (defining premeditation and deliberation) did not replace the reasonable doubt standard with the preponderance of the evidence test by urging the jury to decide material issues by determining which side had presented relatively stronger evidence. (*People v. Streeter* (2012) 54 Cal.4th 205, 253 (*Streeter*).) CALJIC No. 2.51 (on motive) does not improperly allow the jury to find guilt based on the presence of a motive, nor does it lessen the prosecution's burden of proof by shifting the burden to defendants to show absence of motive. (*Streeter*, at p. 253.) Nor, contrary to defendant's apparent view, did the instruction mislead the jury regarding the probative value of motive evidence, given that it directed jurors to give the presence or absence of motive the weight to which they found it to be entitled. (*People v. McKinzie* (2012) 54 Cal.4th 1302, 1356.) "Each of these instructions ' "is unobjectionable when, as here, it is

accompanied by the usual instructions on reasonable doubt, the presumption of innocence, and the People's burden of proof." ' " (*Streeter*, *supra*, at p. 253.)

### 4. *Asserted errors in lying-in-wait special-circumstance instructions*

The jury was given the then standard CALJIC instruction on the lying-in-wait special circumstance, CALJIC No. 8.81.15 (1989 rev.).[6] Defendant contends the instruction failed to explain to the jury that the key elements of the special circumstance—concealment of purpose and watchful waiting for a time to act—referred to a concealed intent *to kill* and waiting for a time to launch a lethal attack. His contention lacks merit.

---

[6] CALJIC No. 8.81.15 (1989 rev.) (5th ed. 1988) read as follows: "To find that the special circumstance, referred to in these instructions as murder while lying in wait, is true, each of the following facts must be proved: [¶] 1. The defendant intentionally killed the victim, and [¶] 2. The murder was committed while the defendant was lying in wait. [¶] The term 'while lying in wait' within the meaning of the law of special circumstances is defined as a waiting and watching for an opportune time to act, together with a concealment by ambush or by some other secret design to take the other person by surprise even though the victim is aware of the murderer's presence. The lying in wait need not continue for any particular period of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation. [¶] Thus, for a killing to be perpetrated while lying in wait, both the concealment and watchful waiting as well as the killing must occur during the same time period, or in an uninterrupted attack commencing no later than the moment concealment ends. [¶] If there is a clear interruption separating the period of lying in wait from the period during which the killing takes place, so that there is neither an immediate killing nor a continuous flow of the uninterrupted lethal events, the special circumstance is not proved. [¶] A mere concealment of purpose is not sufficient to meet the requirement of concealment set forth in this special circumstance. However, when a defendant intentionally murders another person, under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage, the special circumstance of murder while lying in wait has been established. (Brackets omitted.)

28

As defendant acknowledges, in *Streeter*, *supra*, 54 Cal.4th 205, we rejected the contention that CALJIC No. 8.81.15 erroneously permitted the jury to return a true finding on the lying-in-wait special-circumstance allegation based on a nonlethal intent.  (*Streeter*, at p. 251.)  We reasoned the instruction told the jury that " 'for a killing to be perpetuated [*sic*] while lying in wait':  (1) the killing must be *intentional* and (2) 'both the concealment and watchful waiting as well as the killing must occur during the same time period, or in an uninterrupted attack commencing no later than the moment concealment ends.'  In addition, the instruction required an immediate killing or a continuous flow of the uninterrupted lethal events from the period of lying in wait.  [Citation.]  Finally, the instruction stated that, '[W]hen a defendant *intentionally* murders another person, under circumstances which include (1) a concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage, the special circumstance of murder while lying in wait has been established.'  [Citation.]  Because the instruction required an *intentional* killing and an uninterrupted connection between the *lethal acts* and the period of lying in wait, a reasonable jury would not have believed that the nonlethal act and intent [here, that of robbing the victims of the cocaine] would have satisfied the requirements of concealment of purpose and watchful waiting to act."  (*Ibid*.)  Defendant fails to persuade us our reasoning in *Streeter* was flawed, and the same reasoning compels rejection of his claim in this case.

Defendant further contends the instruction is confusing and contradictory and failed to provide the jury with adequate guidance concerning the concept of " 'cognizable interruption' " (*Morales*, *supra*, 48 Cal.3d at p. 558) as it relates to the relevant period of watchful waiting in this case.  In *People v. Cruz* (2008) 44 Cal.4th 636, 678, we held that CALJIC No. 8.81.15 is not " 'impossible to

29

understand and apply,' " and adhere to that view here.  And because we have generally approved the instructional language (e.g., *Sims, supra,* 5 Cal.4th 405, 434 [rejecting challenge to 1983 version of CALJIC No. 8.81.15, which was substantially similar to the 1989 version used in this case]), if defendant wanted the jury to receive more detailed instruction concerning "cognizable interruption" it was incumbent on him to request it.  (See *People v. Hardy* (1992) 2 Cal.4th 86, 153.)  He failed to do so and thus may not complain of the asserted deficiency on appeal.  To the extent defendant may be arguing the evidence in this case established as a matter of law, and the jury should have been instructed, that a cognizable interruption in the required watchful waiting occurred based on his leaving the car to speak with the purported buyer at the latter's house while the victims went inside the convenience store, out of his sight, his argument fails.  As noted, a killer need not keep his intended victim in sight during the entire period of watchful waiting (*Edwards*, *supra*, 54 Cal.3d at p. 825); under the state of the evidence in this case whether a cognizable interruption occurred remained a factual question for the jury.

## B.  Penalty Phase Issues

### 1.  Denial of defendant's motion to exclude evidence of gun possession

Defendant filed two motions to exclude, on Fourth Amendment grounds, evidence of two incidents of illegal gun possession.  The first motion argued that the search of a vehicle parked on Strawberry Street from which a gun was recovered exceeded the scope of a warrant directing the search of the residence at 101 Strawberry Street and "vehicles on said property."  The second motion argued that police had insufficient cause to detain and search defendant and his vehicle parked in the lot of the Circle K convenience store.  The trial court denied both motions and on appeal defendant asserts error in both rulings.

Preliminarily, while acknowledging we have not squarely ruled on the question, the Attorney General contends the exclusionary rule should not apply to the penalty phase of a capital trial when the prosecutor seeks to introduce section 190.3, factor (b) evidence. (See *People v. McKinnon* (2011) 52 Cal.4th 610, 684, fn. 45 [assuming availability of exclusionary remedy]; *People v. Huggins* (2006) 38 Cal.4th 175, 241 [same].) She argues the exclusionary rule has little deterrent value at the penalty phase, the purpose of which is "to enable the jury to make an individualized determination of the appropriate penalty based on the character of the defendant and the circumstances of the crime." (*People v. Cowan* (2010) 50 Cal.4th 401, 499.) That is, she asserts law enforcement would not likely be deterred from conducting unreasonable searches and seizures because of the remote possibility the evidence could not be used during the penalty phase in an unrelated prosecution occurring potentially years later, and any limited deterrent value is outweighed by the societal costs of exclusion of the evidence and the resultant incomplete picture of the defendant's criminal activities.

Given the prosecution's failure to litigate these issues below, we decline to resolve the question whether the exclusionary remedy should remain available for Fourth Amendment violations in connection with factor (b) evidence presented in the penalty phase of a capital trial; we assume its availability for purposes of this appeal and proceed to address the parties' substantive arguments.

### a. Strawberry Street incident

The record of the hearing on defendant's motion to suppress evidence reveals the following: On the morning of February 19, 1987, police executed a warrant to search an apartment located at 101 Strawberry Street in Visalia. Defendant was present in the apartment at the time of the search. Neither defendant nor his vehicle, a black 1974 Monte Carlo which was parked on the street in front of the

31

apartment building, was named in the warrant. A police officer searched defendant's person and recovered car keys from his left front pants pocket. The officer had several times previously seen defendant sitting in the driver's seat of the Monte Carlo, although he had never seen him driving it, and had never seen anyone else in or around the car. Police determined that the keys fit the Monte Carlo and found a small .45-caliber derringer under the driver's seat. When asked, through an interpreter, whether he owned any vehicles, defendant replied he did not; he specifically denied the Monte Carlo belonged to him. The trial court ruled that defendant lacked standing to contest the search of the Monte Carlo because he claimed no ownership or right to possession of it.

Defendant contends the trial court erred in concluding he lacked standing to contest the search. He further contends the search of the Monte Carlo was beyond the scope of the warrant and was otherwise done without probable cause.

"In ruling on a motion to suppress, the trial court must find the historical facts, select the rule of law, and apply it to the facts in order to determine whether the law as applied has been violated. [Citation.] We review the court's resolution of the factual inquiry under the deferential substantial evidence standard. Whether the relevant law applies to the facts is a mixed question of law and fact that is subject to independent review." (*People v. Thompson* (2010) 49 Cal.4th 79, 111–112.)

"[C]apacity to claim the protection of the Fourth Amendment depends . . . upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." (*Rakas v. Illinois* (1978) 439 U.S. 128, 143.) A legitimate expectation of privacy in a vehicle requires a showing of a property or possessory interest therein. (*Id.* at p. 148.) Defendant argues that the fact he possessed the keys to the Monte Carlo raised an inference he lawfully possessed the car, even if it did not belong to him, and that as a

32

consequence he had a legitimate expectation of privacy in the car's contents. As he observes, the prosecution itself at the suppression hearing urged the court to draw the inference defendant possessed the gun based on his possession of the car it was found in. Defendant argued below, and renews the argument here, that the prosecution cannot have it both ways. That is, the prosecution cannot contend both that defendant possessed the car in order to link him to the gun found inside it, and that he lacked a possessory interest in it in order to defeat his claim to a legitimate expectation of privacy for purposes of challenging the warrantless search of the car.

Defendant is correct. The record of the suppression hearing does not support the trial court's implicit finding that defendant disclaimed a possessory interest in the car merely by virtue of denying *ownership* of it; the record does not reflect that defendant was ever asked, for example, whether he had borrowed the car with its owner's permission, and there is no evidence defendant was not legitimately in possession of the car when police searched it. (See *People v. Leonard* (1987) 197 Cal.App.3d 235, 239 [one who has owner's permission to use vehicle and is exercising control over it has a legitimate expectation of privacy in it].) This case is therefore distinguishable from *People v. Dasilva* (1989) 207 Cal.App.3d 43, 49, which the trial court cited in its ruling that defendant lacked standing to challenge the search. In that case, the defendant had voluntarily consented to the search of the trunk of a car, but disclaimed ownership or possession of certain containers found in the trunk. Although the defendant in *Dasilva* did not own, but merely possessed, the car, the parties did not dispute his standing to contest the search of the trunk. In upholding the search of the trunk on a consent theory, the *Dasilva* court implicitly found the defendant's possessory interest in the car supported a finding he had a legitimate expectation of privacy in the trunk. At the same time, the court concluded the defendant's disclaimer of ownership or possession of the

33

containers found in the trunk precluded him from challenging the admission of their contents. (*Ibid.*) Here, as noted, the evidence presented at the suppression hearing failed to support an inference that defendant lacked a possessory, as distinct from an ownership, interest in the Monte Carlo.

As to whether the search of the Monte Carlo was proper because it was within the scope of the warrant or supported by probable cause, the Attorney General concedes the Monte Carlo was not on the property—the Strawberry Street residence—described in the warrant. She nonetheless contends that, given its close proximity to the Strawberry Street residence and defendant's statement that the vehicle was not his, which she asserts demonstrated a lack of candor, it was reasonable for the officers to enter the vehicle to determine if it was associated with the residence. The contention lacks merit. Defendant's truthful statement that the Monte Carlo did not belong to him cannot reasonably be equated to a lack of candor justifying a warrantless search. As defendant reasons, the fact he obviously had possession of the vehicle—the keys having been found in his pocket—suggests that, rather than trying to mislead officers with an easily disprovable lie, he understood their question to refer to ownership, not possession. And the Attorney General cites no authority for the proposition that a vehicle's mere proximity to a place designated in a search warrant justifies a search of that vehicle. We therefore conclude the trial court erred in denying defendant's motion to exclude the evidence of the gun found in the Monte Carlo on Strawberry Street.

### b. Circle K convenience store incident

The record of the hearing on defendant's motion to suppress revealed the following: About 10:16 p.m. on March 16, 1989, Officer Michael Stowe of the Visalia Police Department saw a van parked on the north side of the Circle K store parking lot on Old Dinuba Boulevard in a poorly lit area lacking demarcated

34

parking spots. The store had lights on under an awning on the west side of the building; the vehicle was six to eight feet from the store, pointed west toward the front of the store. Officer Stowe was aware of thefts from the store "where subjects [would] exit to the north and sometimes leave in vehicles." Because of his knowledge of prior thefts and the fact the van was parked in a less well-lit part of the lot and not in the marked spaces immediately next to the store, he stopped to investigate the vehicle and its occupants, believing a robbery might be in progress. Officer Stowe pulled in behind the vehicle and approached defendant, the only occupant, who was seated in the driver's seat. Defendant told Stowe he did not have identification, but gave him the vehicle registration and explained the van was owned by his friend's uncle. After the officer was unable to confirm defendant's identity using the name he had given the officer, defendant gave the officer permission to search the van. About that same time, defendant's companion returned from the Circle K carrying a bag, and police questioned him and ran a database check on him. A second officer who had arrived on the scene asked store personnel whether defendant's companion had stolen anything, and apparently was told nothing had been stolen. Nonetheless, because defendant had been unable to produce identification and the car was not his, and for officer safety, Stowe patted defendant down and in his front right pocket found a wad of paper that proved to be cash totaling $1,464. Stowe then entered the vehicle and found a gun on the floorboard to the right side of the driver's seat.

The trial court ruled as follows: (1) defendant was detained within the meaning of *Terry v. Ohio* (1968) 392 U.S. 1 until after Officer Stowe concluded his identification procedure; (2) Stowe had reasonable suspicion to detain defendant based on the prior robberies at the Circle K and the fact defendant was parked in a poorly lit section of the parking lot, although spaces were available in the well-lit section of the lot; (3) Stowe violated defendant's Fourth Amendment

35

rights by reaching into his pocket and retrieving cash, when the officer acknowledged he did not think defendant had a weapon or other contraband in the pocket, necessitating suppression of the cash; and (4) the subsequent search of the vehicle and discovery of the weapon in plain sight were lawful based on defendant's consent. Defendant contends the trial court erred, both in finding reasonable suspicion to detain him and in finding lawful consent to search the vehicle immediately after the officer had illegally searched defendant's person.

The Fourth Amendment protects against unreasonable searches and seizures. (U.S. Const., 4th Amend.; *Terry v. Ohio*, *supra*, 392 U.S. at p. 8.) "A detention is reasonable under the Fourth Amendment when the detaining officer can point to specific articulable facts that, considered in light of the totality of the circumstances, provide some objective manifestation that the person detained may be involved in criminal activity." (*People v. Souza* (1994) 9 Cal.4th 224, 231.) Such reasonable suspicion cannot be based solely on factors unrelated to the defendant, such as criminal activity in the area. (See *Illinois v. Wardlow* (2000) 528 U.S. 119, 124 [individual's presence in an area of expected criminal activity not alone sufficient to support reasonable suspicion he or she is committing a crime].)

We agree with defendant that his mere presence in a car legally parked on the less illuminated north side of the convenience store, in an area without demarcated parking spaces at a time when other parking spaces were available, did not justify his detention. The circumstance that Officer Stowe was aware of prior robberies at the store and that in some instances robbers had exited the parking lot on the north side of the building, without more, did not raise a reasonable suspicion that defendant was engaged in criminal activity. As noted (see *Illinois v. Wardlow*, *supra*, 528 U.S. at p. 124), a subject's presence in an area of expected criminal activity does not alone support a reasonable suspicion he or she is committing a

36

crime. No evidence was presented at the suppression hearing, for example, of the overall frequency of thefts at the Circle K or that robbers did not also commonly park on, or exit via, the better-illuminated west side of the store. Officer Stowe described no furtive movement or other behavior by defendant suggestive of criminal activity. At the point when the officer initiated the identification procedure, therefore, he had no factual basis for a reasonable suspicion, as opposed to a mere hunch, that defendant was then engaged in any criminal activity, and a hunch is an inadequate basis for a detention. (*People v. Wells* (2006) 38 Cal.4th 1078, 1083; *In re Tony C.* (1978) 21 Cal.3d 888, 894; see *People v. Perrusquia* (2007) 150 Cal.App.4th 228, 231–234 [no reasonable suspicion where the defendant, in an idling car in a parking spot in a high-crime area, got out of the car upon observing a police officer and refused the officer's request to allow a patdown search].) The detention being unlawful, the subsequent searches of defendant's person and the car he had been sitting in were also unlawful. The trial court thus properly excluded the evidence of the cash found on defendant's person, but erred in admitting evidence of the gun found in the van. (*Perrusquia*, at p. 234; see *Florida v. Royer* (1983) 460 U.S. 491, 501 [illegality of detention tainted and invalidated subsequent consent to search]; *People v. Zamudio* (2008) 43 Cal.4th 327, 341.)

### c. Prejudice

The error, however, was harmless under any standard. (See *People v. Jones* (2003) 29 Cal.4th 1229, 1264, & fn. 11.) In addition to the evidence of the cold and calculated nature of the capital crime, the jury heard abundant other aggravating evidence, consisting of defendant's two felony convictions and incidents of unadjudicated violent criminal conduct, including his shooting at a car, his participation in the Boas Minnow Farm robbery, and his possession of a

gun on another occasion, when arrested at the Arrow Motel. It also heard evidence of his role in the kidnapping and sexual abuse of Rosa. In contrast, the erroneously admitted evidence of gun possession, although the subject of comment by the prosecutor during his closing argument, was relatively mild. Defendant points out that the jury deliberated over the course of four days, even though the evidentiary portion of the penalty phase encompassed only two partial days of trial and a brief part of a third day; the absolute length of deliberations, he contends, and their length relative to the time spent on the presentation of evidence signify that the jury found this to be a close case, in turn increasing the chances that any penalty phase error was prejudicial.

We are not persuaded. Although the length of time consumed in presenting the penalty phase evidence may not have been great relative to the amount of time the jury spent deliberating, the number of incidents reflected in the evidence, even excluding the gun possession incidents we have determined should have been excluded, and the quantity of mitigating evidence were substantial. That the jury sent the judge a note inquiring about the practical effect of a sentence of life without parole surely indicated it was performing its duty to fairly consider both penalties, but without more does not strongly suggest it found this to be such a close case that the admission of the two gun incidents under factor (b) prejudiced defendant.

In sum, although we conclude the admission of evidence of the guns found in the car parked outside 101 Strawberry Street and in the van parked outside the Circle K violated defendant's Fourth Amendment rights, the error was harmless under any standard.

## 2. *Exclusion of evidence that defendant's father kidnapped and raped defendant's mother in the same manner that he kidnapped and raped Rosa B.*

"[T]he Eighth and Fourteenth Amendments require that the sentencer" in a capital case "not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." (*Lockett v. Ohio* (1978) 438 U.S. 586, 604; see *Skipper v. South Carolina* (1986) 476 U.S. 1, 4–8.) In addition, due process requires that a defendant be allowed the opportunity to explain aggravating evidence. (*Gardner v. Florida* (1977) 430 U.S. 349, 362.) Defendant contends the trial court denied him these constitutional protections by excluding, on the prosecutor's Evidence Code section 352 objection, evidence that his father kidnapped and raped defendant's mother in the same way he kidnapped and raped Rosa B. As we shall explain, the trial court's ruling did not violate defendant's constitutional rights.

During the defense case in mitigation in the penalty phase, defense counsel called Maria de Jesus Casares de Reyna, defendant's maternal aunt, as a witness. Defense counsel asked her if she knew how defendant's mother came to marry his father. The prosecutor objected under Evidence Code section 352 that the question sought information going beyond possible trauma to defendant. Defense counsel explained that the witness would testify the father kidnapped defendant's mother the same way that Rosa B. was kidnapped, at about the same age, and continued to beat her from that point on. Counsel contended the testimony would be foundational, "just to kind of set the stage for the type of man [the father] was and the abuse he continued to pour on the mother." The prosecutor rejoined, "I think Counsel has not only set the stage, but he has populated it thoroughly with witnesses who all know how bad the man was." The court sustained the objection, agreeing with the prosecutor that the jury knew defendant's father was a cruel and

sadistic man who mistreated his family and noting defendant would not have been a percipient witness to the abduction and rape.

Defendant contends the proffered testimony was relevant mitigating evidence and not cumulative or unduly time consuming. He argues the evidence showed the torturous environment he was born into and the duration of the abuse to which he was both a witness and a victim. Even if not consciously remembered, he contends, early childhood trauma may have " 'catastrophic and permanent effects' " on its survivors, and the proffered evidence would have "strongly suggested" his mother was subject to abuse during defendant's in utero development and was impaired as a caregiver as a result of the continuing abuse. Finally, he contends, the evidence was relevant to rebut the prosecutor's insinuation that the defense had portrayed defendant's father as more evil than he really was, to show the utter dominance defendant's father exerted over the family and thus to support the duress defense, and, even if the jury believed defendant participated voluntarily in raping Rosa, to lessen the impact of this evidence by showing that violent sexual abuse of women was modeled by his father.

We disagree with defendant's contention that counsel's statement that Casares de Reyna's proffered testimony was relevant to show the duration and form of the father's victimization of defendant's mother sufficed to put the court on notice that the evidence was also relevant to prove his mother was impaired as a caregiver, or that defendant's actions with respect to Rosa reflected the father's "modeling" of similar behavior. Because defendant did not adequately articulate these theories of relevance to the trial court, he may not predicate on them an appellate claim of error in the exclusion of the evidence. (Evid. Code, § 354.) Since the prosecutor's suggestion that the defense may have portrayed the father as more evil than he actually was occurred during closing argument, the court in

40

making its ruling had no basis on which to assess its relevance as rebuttal to that suggestion.

In any event, the trial court did not abuse its discretion in excluding the proffered evidence. As the Attorney General observes, by the time defendant proffered the testimony of Casares de Reyna, the jury had heard several family members testify regarding the father's extensive abuse of defendant, his mother, and other family members, as well as Dr. Blak's expert opinion regarding the effects of that abuse on defendant. Defendant's younger sister, Maria Delores Lupercio Casares, testified that their father used to hit defendant "a lot," and physically hurt or hit her mother and all of her siblings. Defendant's cousin Antonio Navarro Lupercio testified that he saw defendant's father physically abuse all members of the family and beat defendant to the point of unconsciousness, and that defendant was "very much" afraid of his father. Defendant's uncle Alfredo Navarro testified he had often seen defendant's father strike defendant with pieces of wood, and defendant appeared to be very much afraid of his father. Finally, defendant cites nothing in the record before the trial court supporting an inference his mother's caregiving was negatively affected by the abuse, and we will not assume that to have necessarily been the case; hence, defendant's contention the proffered evidence would have been relevant to support such an inference fails as speculative and for lack of foundation.

### 3. Admission of defendant's juvenile misconduct in aggravation

Defendant contends the admission of evidence of his participation in the kidnapping and rape of Rosa B. when he was 16 years old violated his federal constitutional rights to unanimous jury findings of guilt beyond a reasonable doubt on all elements increasing his sentence, to due process and equal protection, and to a reliable penalty determination proportionate to his culpability. He relies on the

41

United States Supreme Court's decision in *Roper v. Simmons* (2005) 543 U.S. 551, 574 (*Roper*), which held that, because of the differences in maturity and judgment between adult and juvenile offenders, death is a disproportionate penalty for crimes committed by a juvenile defendant.  He also contends that the circumstance that California law does not permit the use of *adjudicated* juvenile misconduct as section 190.3, factor (c) evidence in the penalty phase of a capital trial (*People v. Lewis* (2008) 43 Cal.4th 415, 530) renders the use of *unadjudicated* juvenile misconduct as section 190.3, factor (b) evidence a violation of due process and equal protection.  Defendant acknowledges we have held, to the contrary, that nothing in the death penalty law precludes the use of unadjudicated juvenile misconduct as an aggravating factor under section 190.3, factor (b), but asks us to reconsider that conclusion in light of *Roper*.  His argument fails to persuade us, and we reaffirm our previous holdings on the point.  (E.g., *People v. Bivert* (2011) 52 Cal.4th 96, 122.)

### 4. *Sufficiency of factor (b) evidence*

Section 190.3, factor (b) allows the trier of fact, during the penalty phase, to consider evidence of "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."  Defendant contends the trial court erred in admitting evidence of his prior unadjudicated criminal conduct under section 190.3, factor (b), because each instance of misconduct was either legally or factually insufficient to qualify as factor (b) evidence.  He contends these errors rendered his penalty trial unfair and necessitates reversal of his death sentence.

Preliminarily, as the Attorney General contends, defendant forfeited his contentions by failing to raise them in the trial court. As we shall see, however, even had the contentions not been forfeited, they lack merit.

### a. Incidents involving Rosa B.

In its notice of aggravation, the prosecution indicated it would try to prove that defendant participated in the "kidnapping and repeated rapes of 14 year old Rosa [B.]" Defendant moved in limine under *People v. Phillips* (1985) 41 Cal.3d 29, 68, to exclude the incidents as supported by insufficient evidence, in light of his defense that his father forced him to engage in the kidnapping and rapes with threats of physical harm. The prosecution opposed the motion, arguing Rosa's account reflected defendant acted with his father and his claim of coercion was one the jury might choose to disbelieve. Trial counsel later withdrew the motion because, based on his reexamination of Rosa's original statements to law enforcement, he believed sufficient evidence supported presentation of the issue to the jury. In her testimony before the jury, however, Rosa repeatedly asserted that defendant's father forced him to assist in the kidnapping and to have sexual relations with her, and that defendant did not engage in that behavior except under his father's threat of force. Trial counsel later moved to modify the verdict under section 190.4, subdivision (e), claiming, among other things, the evidence was uncontroverted that defendant was forced to participate in the offenses against Rosa. The trial court denied the motion without comment on the Rosa B. incident.

On appeal, defendant renews his contention the trial court erred in admitting the evidence. He argues that the penalty phase jury should not be permitted to consider an uncharged crime as an aggravating factor "unless a ' "rational trier of fact could have found the essential elements of the crime beyond a reasonable

43

doubt." ' " This standard was not met, he asserts, because the evidence showed he had a complete defense—that of duress.

Although the absence of written jury findings in the penalty phase means the record does not reveal whether jurors ultimately found true individual aggravating incidents as alleged and argued by the prosecution under factor (b) (see *People v. Lewis*, *supra*, 43 Cal.4th at p. 533 [no constitutional requirement of written findings regarding aggravating factors]), if the record contains insufficient evidence to support an aggravating factor this court must "presume that at least one did so. Otherwise, we would run an unacceptable risk of rejecting a potentially meritorious claim by gratuitously denying the existence of its factual predicate." (*People v. Clair* (1992) 2 Cal.4th 629, 680.) Thus, error in admitting insufficiently supported aggravating incidents is not necessarily rendered harmless by instructing jurors not to consider the incidents unless they find them proved beyond a reasonable doubt.

Here, however, because a rational juror could have found from the prosecution's evidence, taken as a whole, that defendant committed the alleged offenses, the trial court did not err in admitting the evidence. Rosa testified that, when she was about 12 years old, defendant and his father, mother, uncle, and at least two other family members—some of them armed—came to her sister's house and forcibly took her to defendant's father's ranch, where she was held for about five months. During that time, defendant repeatedly had sexual intercourse with her, each time at his father's direction. Defendant never physically hurt her, and she participated in sex with him because his father threatened to kill her. When she asked defendant why he did not defend her, he told her his father would kill him. On several occasions she heard his father threaten to kill him if he did not do as he was told. Rosa acknowledged that several months before the abduction, defendant had asked her to be his girlfriend and she had declined, and that

44

defendant's father had told her, several times, she was going to be his daughter-in-law.  Importantly, Detective Pinon testified in rebuttal that when he interviewed Rosa before trial, she described the sexual assaults she had endured without telling him that defendant's father had been present at all times or that he had forced defendant to assault her, although she did say she had sex with defendant out of fear because defendant's father had threatened to kill her if she refused.  She also told Detective Pinon defendant's father threatened her on a daily basis and threatened to kill her if she left.

The prosecutor argued to the jury that, although defendant's father was a "palpably evil man" who had probably instigated the kidnapping and assaults, defendant had nevertheless acted in concert with his father to some degree, citing the evidence that, before the kidnapping, defendant had expressed his affinity for Rosa by asking her to be his girlfriend, and never warned her of the danger she faced when she declined.  The prosecutor also expressed skepticism, given the sheer number of times defendant sexually assaulted Rosa, that he did so on each occasion only because his father ordered or threatened him.

Defendant contends the uncontroverted facts showed that he acted involuntarily, under duress, and that both he and Rosa were the victims of his father's violent, sadistic conduct.  As such, he argues, the incident actually militated in favor of a lesser penalty and could not constitutionally be used in aggravation.  He likens his case to *Beam v. Paskett* (9th Cir. 1993) 3 F.3d 1301, disapproved on another ground in *Lambright v. Stewart* (9th Cir. 1999) 191 F.3d 1181, where the federal Court of Appeals granted habeas corpus relief under the Eighth and Fourteenth Amendments based in part on the state sentencing court's erroneous consideration of evidence that the defendant had a history of deviant sexual behavior and abnormal sexual relationships, when in fact the defendant was himself a victim of gross sexual abuse at the hands of his father.  (3 F.3d at p.

45

1308 & fn. 6.) We find *Beam* inapposite. Unlike in this case, the sexual behavior erroneously considered there was nonviolent and either consensual or involuntary on the defendant's part. Nor has defendant demonstrated he acted at all times under such duress that no reasonable fact finder could have found the essential elements of an offense against Rosa. "The defense of duress is available to defendants who commit crimes, except murder, 'under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused.' " (*People v. Wilson* (2005) 36 Cal.4th 309, 331.) "Because the defense of duress requires a reasonable belief that threats to the defendant's life . . . are both imminent and immediate at the time the crime is committed [citations], threats of future danger are inadequate to support the defense." (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 100; see *People v. Lo Cicero* (1969) 71 Cal.2d 1186, 1191.)[7] Given the length of Rosa's ordeal and the frequency of the sexual assaults she endured, along with the lack of specific evidence that defendant's father in every instance threatened defendant's life if he

---

[7]     Defendant urges that one may make out a complete defense of duress by showing fear of great bodily harm falling short of a fear of death, citing *People v. Perez* (1973) 9 Cal.3d 651, 657 ("Although a number of cases in this state have held that the fear [delineated in section 26] must literally be of *death*, *People* v. *Otis*[ (1959)] 174 Cal.App.2d 119, 124 [344 P.2d 342], suggests that the fine distinction between fear of danger to life and fear of great bodily harm is unrealistic."). *Perez*'s comment may reflect a recognition that a threat to inflict great bodily harm implies, at least in some circumstances, a readiness to use force sufficient to threaten one's very life as well. Many decisions, accordingly, focus not on whether an explicit threat to life is present but rather on the requirement that the threat be immediate, as opposed to a threat of future violence. (E.g., *People v. Perez*, *supra*, at pp. 657–658.) We need not here resolve any conflict in the decisions because the testimony did not specifically link defendant's father's threats with particular assaults. In other words, the defense evidence failed to so conclusively establish the immediacy of the threats as to take the Rosa B. incident out of section 190.3, factor (b).

46

failed to assault her as ordered, as well as her failure to mention to Detective Pinon that defendant at all times acted under threat of death from his father, a reasonable fact finder could have concluded the evidence supported a finding defendant committed the essential elements of one or more offenses against her. The trial court therefore did not err in submitting the evidence to the jury under section 190.3, factor (b). Doing so did not preclude jurors from according the evidence whatever mitigating weight they may have felt it warranted.

### b. *Shooting at moving vehicle*

Defendant next contends the trial court erred in submitting to the jury under section 190.3, factor (b) evidence of an incident in which he shot at an occupied vehicle moving through a parking lot in Tulare. Defense counsel filed and then withdrew a pretrial motion to exclude the evidence under *People v. Phillips*, *supra*, 41 Cal.3d at page 68, while objecting to any use of the term "attempted murder" to describe the incident. The prosecutor conceded he lacked evidence defendant entertained a specific intent to kill anyone in the incident, and agreed not to use the term. Instead, he stated, he would describe the act as an assault with a deadly weapon or shooting at an occupied vehicle; no reference to attempted murder was made in the jury's presence.

The prosecution called Tulare Police Officers Rush Mayberry and Thomas Munoz to testify regarding the incident. Mayberry testified that, after midnight on August 8, 1979, he was parked facing north at the intersection of Pratt Street and Inyo Avenue, across the street from a shopping center. He observed three vehicles—two parked and a white one moving—in the shopping center parking lot. As the white car passed the two parked cars, defendant went to the back seat of one of them, retrieved a rifle, and fired twice at the passing car from a distance of about 50 feet. The shots left a dent in the lower part of the car's trunk and a

second dent in the left hand corner of the rear bumper.  Mayberry responded to the scene and detained defendant and two others.  He retrieved a loaded rifle from the back seat of one of the cars.

Officer Munoz testified he acted as the interpreter for the detective who interviewed defendant the following morning.  In that interview, defendant told police he had been drinking at the time of the incident and had acted in self-defense.  Before he shot at the white car, it had driven by three times.  The people in the car were calling him "wetback" and "son of a bitch" and making threats of bodily harm.  After one of the threats, one of the people in the car got out, walked up to defendant and told him, "I have a gun, and I can kill you if I want to."  Defendant then took a rifle from the trunk of his car, placed it in the front seat, and waited with the people in the parked car with whom he had been speaking.  On the white car's final pass, defendant saw one of its occupants gesture for him to come to the vehicle, and defendant assumed he wanted a confrontation.  Defendant then shot at the moving car, aiming at the tires.  He believed the people in it had a gun.

As he did in connection with evidence of the Rosa B. incident, defendant contends the evidence should have been excluded because a rational trier of fact could not find beyond a reasonable doubt it demonstrated a crime had been committed.  He notes the prosecutor presented no evidence contradicting his self-defense justification and even conceded there was no evidence defendant was trying to kill the victims.  (See *People v. Minifie* (1996) 13 Cal.4th 1055, 1064–1065 [defense of self-defense is established when the defendant has an honest and reasonable belief that bodily injury is about to be inflicted on him, provided he uses force no greater than that reasonable under the circumstances].)  But the state of the evidence did not obligate jurors to accept defendant's self-serving version of events.  As the Attorney General reasons, the testimony of the sole percipient witness did not suggest that any of the occupants of the white car displayed or

48

otherwise used a weapon, and defendant himself told the investigating officer he never saw a gun. Moreover, when defendant shot at the car, it was traveling away from him and thus, inferably, did not present an imminent threat. The question whether defendant acted in self-defense was therefore one for the jury, and the court did not err in admitting the evidence.

### c. *Incidents of gun possession*

By means of pretrial motions in limine, defendant unsuccessfully sought to preclude the prosecution from introducing, under section 190.3, factor (b), evidence that on several occasions he illegally possessed firearms, contending such possession was unrelated to any actual violence or threat of violence. The trial court concluded that if the prosecution could establish defendant actually or constructively possessed the weapons, "an assumption there was an implied threat of violence" would follow. The court reasoned: "I am partial to the district attorney's argument that if you look at the totality of the circumstances of the evidence the jury will hear in this case regarding Casares, . . . if they can establish that he had actual or constructive possession, gives rise to an assumption there was an implied threat of violence there. . . . [¶] Handguns or most handguns, unless they're clearly for competition like a target pistol, have one purpose. That is either offensive use or defensive use to shoot at somebody. Carrying one around in a car in a position where this gun was found I think can give rise to a reasonable assumption that its purpose involved implied use of violence in the future, some undetermined time point. [¶] Again, it may be a question of fact whether the jury accepts that. . . . I don't think simply allowing that evidence to come before the jury, if it gets to a penalty phase, make it per se evidence that the jury has to accept it. I still think that they have a function to decide whether this is a factor that they should consider in the penalty phase." The court ruled the evidence admissible,

49

noting the defense could argue the inferences it wished the jury to draw from the evidence.

Defendant contends the court erred by submitting to the jury the issue of whether the gun possession incidents constituted implied threats to use force or violence rather than deciding the issue itself. (See § 190.3, factor (b).) He also contends the court erred in concluding the jury could consider illegal weapon possession as constituting an implied threat to use violence at some "undetermined time point" in the future, rather than requiring it to find that the weapons were intended for some imminent or actual threat. Finally, he contends that, in addition to violating state law, the introduction of the evidence infringed the Eighth and Fourteenth Amendments to the federal Constitution by undermining the reliability of the jury's death verdict and his state law liberty interests.

Preliminarily, because we have concluded the trial court erred in denying defendant's motion to suppress evidence of the Strawberry Street and Circle K incidents, we need not address his contentions regarding the admissibility of those incidents under section 190.3, factor (b). Our discussion therefore pertains only to his contentions respecting the Arrow Motel gun possession incident.

Defendant is correct that "[p]ossession of a firearm is not, in every circumstance, an act committed with actual or implied force or violence" (*People v. Bacon* (2010) 50 Cal.4th 1082, 1127 (*Bacon*)), and although the question whether particular acts occurred is a factual matter for the jury, "the *characterization* of those acts as involving an express or implied use of force or violence, or the threat thereof, [is] a legal matter properly decided by the court" (*People v. Nakahara* (2003) 30 Cal.4th 705, 720), whose ruling admitting such evidence is reviewed for abuse of discretion (*Bacon*, *supra*, at p. 1127). We disagree, however, with the premise of defendant's argument. As we read the pertinent transcripts, the trial court did not fail to determine the legal question

50

whether the incidents reflected an implied threat to use force or violence. The court stated: "I am partial to the district attorney's argument that if you look at the totality of the circumstances of the evidence the jury will hear in this case regarding Casares, his possession, if they can establish that he had actual or constructive possession, gives rise to an assumption there was an implied threat of violence there. That would be my position on it." The court's statements that admission of the incidents did not make them "evidence that the jury has to accept" and that "they have a function to decide whether this is a factor that they should consider in the penalty phase" reflected its understanding that the jury would determine whether in fact defendant constructively possessed the guns and, if so, what aggravating weight to give the incidents. Notably, nothing in the court's instructions told the jury to determine whether such constructive possession involved an express or implied use of force or violence, or a threat thereof. The court did not abuse its discretion.

Nor did the court abuse its discretion in submitting the incident to the jury based on an assumption the weapon would be used in an implicitly threatening manner at some undetermined future time rather than excluding the incident for lack of evidence of an imminent express or implied threat of violence. Defendant cites no decision of this court imposing such a requirement, but asks us to introduce such a "limiting principle" in our section 190.3, factor (b) analysis of noncustodial criminal weapons possession charges. We decline to do so and adhere to our reasoning in *Bacon*, *supra*, 50 Cal.4th at page 1127, that evidence of defendant's illegal possession of a weapon was sufficient to support an inference his possession constituted an implied threat of violence. (See *People v. Michaels* (2002) 28 Cal.4th 486, 536 (*Michaels*).) Our rejection of defendant's state-law challenges to the admissibility of the incident dictates rejection as well of his derivative Eighth and Fourteenth Amendment challenges.

51

### 5. *Constitutionality of lying-in-wait as death-eligibility criterion*

As stated, the lying-in-wait special circumstance requires proof of an intentional murder committed under circumstances that include (1) concealment of purpose, (2) a substantial period of watching and waiting for an opportune time to act, and, (3) immediately thereafter, a surprise attack on an unsuspecting victim from a position of advantage. (§ 190.2, subd. (a)(15); *People v. Bonilla* (2007) 41 Cal.4th 313, 330.) Concealment of the killer's presence, as distinct from his or her purpose, is not required (*Carpenter*, *supra*, 15 Cal.4th at p. 388), and the period of watching and waiting "need not continue for any particular length ' "of time provided that its duration is such as to show a state of mind equivalent to premeditation or deliberation." ' " (*Stevens*, *supra*, 41 Cal.4th at p. 202, quoting *Sims*, *supra*, 5 Cal.4th at pp. 433–434.)

Defendant contends that, as thus construed by this court, the lying-in-wait special circumstance violates the Eighth Amendment by failing to narrow the class of persons eligible for the death penalty and failing to provide a " ' "meaningful basis for distinguishing the few cases in which [the death penalty] is imposed from the many cases in which it is not." ' " (*Godfrey v. Georgia* (1980) 446 U.S. 420, 427, quoting *Gregg v. Georgia* (1976) 428 U.S. 153, 188.). Specifically, he urges that our "expansive conception" of the first two elements of the special circumstance—concealment of purpose and a substantial period of watching and waiting—results in its application to an "enormous" class of first degree murders. Indeed, he contends our construction of the special circumstance is indistinguishable from premeditated and deliberate murder, and from murder on a lying-in-wait theory.

We have repeatedly rejected his contentions. As we said in *People v. Carasi* (2008) 44 Cal.4th 1263, 1310 (*Carasi*), "[T]he lying-in-wait special circumstance . . . is limited to intentional murders that involve a concealment of

52

purpose and a meaningful period of watching and waiting for an opportune time to attack, followed by a surprise lethal attack on an unsuspecting victim from a position of advantage." (See *Morales*, *supra*, 48 Cal.3d at p. 557.) Defendant acknowledges we have differentiated between the lying-in-wait special circumstance and lying in wait as a theory of first degree murder on the bases that the special circumstance requires an intent to kill (unlike first degree murder by lying in wait, which requires only a wanton and reckless intent to inflict injury likely to cause death) and requires that the murder be committed "while" lying in wait, that is, within a continuous flow of events after the concealment and watching and waiting end. (*Michaels, supra,* 28 Cal.4th at p. 517; *Morales*, *supra*, at p. 558.) Contrary to defendant's argument, the lying-in-wait special circumstance is not coextensive with either theory of first degree murder; it does not apply to all murders and is not constitutionally infirm. (*Streeter*, *supra*, 54 Cal.4th at p. 253; see *People v. Johnson* (Jan. ___, 2016, S178272) __ Cal.4th ___, ___–___ [pp. 42–43].) We reject defendant's contentions that the lying-in-wait special circumstance fails to meaningfully distinguish death-eligible defendants from those not death-eligible and is overbroad as applied to this case.

Acknowledging that this court has repeatedly rejected the argument the lying-in-wait special circumstance unconstitutionally fails to provide a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many in which it is not (see *Furman v. Georgia* (1972) 408 U.S. 238, 313 (conc. opn. of White, J.); *Carasi*, *supra*, 44 Cal.4th at p. 1310), defendant contends the special circumstance violates the Eighth Amendment for other reasons. It has, he argues, become an arbitrary and disproportionate way of selecting those eligible for death. Specifically, he contends that, because of the "extraordinarily broad definition" of lying in wait adopted by this court, a large percentage of all murders are death eligible under this special circumstance alone, resulting in a statistical

53

disparity between the large number of defendants so made eligible for death and the small number of defendants actually sentenced to die solely because of their act of lying in wait. Because of this disparity and the absence of a compelling argument or evidence suggesting that lying in wait is considered among the most reprehensible forms of murder, he contends, the imposition of the death penalty based solely on a finding of lying in wait is an unconstitutionally arbitrary and disproportionate punishment.

Defendant observes that, in assessing whether a penalty is disproportionate, the United States Supreme Court has considered " 'objective indicia of society's standards, as expressed in legislative enactments and state practice' to determine whether there is a national consensus against the sentencing practice at issue." (*Graham v. Florida* (2010) 560 U.S. 48, 61.) Drawing on Justice Broussard's concurring and dissenting opinion in *People v. Webster* (1991) 54 Cal.3d 411, 467–468 (conc. & dis. opn. of Broussard, J.), he contends no such national consensus supports the lying-in-wait special circumstance. Among the states imposing the death penalty, he asserts only three, apart from California, treat lying in wait as a death-eligibility criterion (Colo. Rev. Stat., former § 16-11-103(6)(f); see now *id.*, § 18-1.3-1201(5)(f); Ind. Code, § 35-50-2-9(b)(3); Mont. Code Ann. § 46-18-303(1)(iv)); of those states, Indiana requires that the defendant be physically concealed from the victim (see, e.g., *Davis v. State* (Ind. 1985) 477 N.E.2d 889, 895–896), Montana appears to have applied its lying-in-wait aggravator only in cases in which the defendant concealed his presence (see, e.g., *State v. Dawson* (1988) 233 Mont. 345, 358 [761 P.2d 352]; *Fitzpatrick v. State* (1981) 194 Mont. 310, 332 [638 P.2d 1002]), and in Colorado lying in wait is understood to include the killer's concealment of his presence (see, e.g., *People v. Dunlap* (Colo. 1999) 975 P.2d 723, 751). The United States Supreme Court has found that no national consensus exists where only a handful of states retain a

54

particular capital punishment practice. (*Kennedy v. Louisiana* (2008) 554 U.S. 407, 426 (*Kennedy*)) [finding it significant that 45 jurisdictions do not allow capital punishment for child rape]; *Atkins v. Virginia* (2002) 536 U.S. 304, 313–315 (*Atkins*) [finding that opposition of 30 states, and unilateral direction of change, reflect consensus against execution of intellectually disabled defendants]; *Enmund v. Florida* (1982) 458 U.S. 782, 789 (*Enmund*) [noting that Florida was one of only eight jurisdictions authorizing the death penalty for felony murder simpliciter].) "Actual sentencing practices are an important part of the Court's inquiry into consensus." (*Graham*, *supra*, at p. 62 [noting that life without possibility of parole sentences for juvenile nonmurderers are infrequent].) In this vein, defendant notes that, until this case, we apparently have reviewed only two death sentences predicated on a sole special circumstance of lying in wait. (*Jurado*, *supra*, 38 Cal.4th 72; *Edwards*, *supra*, 54 Cal.3d 787.) Furthermore, the high court views the number of executions actually carried out as informing consideration of whether capital punishment for a particular crime "is regarded as unacceptable in our society" (*Kennedy*, *supra*, at p. 433; see *id.* at p. 425 [noting infrequency of executing intellectually disabled and juvenile offenders]); defendant points out that, of the 13 executions carried out in California since reinstatement of the death penalty in 1978, none involved a sole special circumstance of lying in wait. Finally, defendant notes that "consistency in the direction of change regarding a form of punishment may support a finding of national consensus either for or against a particular punishment practice." Apart, however, from reiterating the rarity, among capital punishment jurisdictions, of lying in wait as a death-eligibility factor, defendant provides no historical information regarding any change, to or away from, the use of lying in wait for this purpose.

55

We find the authorities defendant cites distinguishable from the present case. *Atkins*, *supra*, 536 U.S. 304, *Ford v. Wainwright* (1986) 477 U.S. 399, 410, and *Roper*, *supra,* 543 U.S. 551, reflect the high court's determinations that certain offenders—the intellectually disabled, the insane, and minors—who share a characteristic reflecting the degree to which they are capable of acting with criminal responsibility or appreciating the penal consequences of their criminal acts are, by virtue of that characteristic, deemed insufficiently culpable to be subjected to the death penalty under the Eighth and Fourteenth Amendments. The challenge defendant makes here, of course, relates not to a characteristic of a given offender or category of offender, but to the lying in wait special circumstance as California has defined it. Defendant also cites a case (*Kennedy*, *supra*, 554 U.S. 407) falling within the category of nonhomicide crimes against the person, not involving an intent to kill, as to which the high court has determined the death penalty to be unconstitutionally disproportionate. (*Id.* at p. 421 [rape of a child]; see *Coker v. Georgia* (1977) 433 U.S. 584, 592 [imposition of the death penalty for rape of an adult woman constitutes cruel and unusual punishment under the 8th and 14th Amends].) Here, of course, defendant has been convicted of the most serious kind of homicide: first degree murder. Finally, defendant relies on homicide cases in which the high court has concluded that the degree of a defendant's participation in the crime did not reach the level constitutionally required to subject him or her to the death penalty. Thus, in *Enmund*, *supra*, 458 U.S. at page 798, the court held the Eighth Amendment forbids imposition of the death penalty for a felony murder on one who neither personally kills, tries to kill, nor intends to kill; in *Tison v. Arizona* (1987) 481 U.S. 137, 158, the court clarified that the Eighth Amendment is satisfied if the defendant was a major participant in the felony and acted with reckless indifference to human life. Here,

56

apart from contesting his identity as the killer, defendant does not claim his role in the murder of Sanchez was too minor to satisfy Eighth Amendment requirements.

In sum, defendant cites no case, and we are aware of none, in which the high court has held, whether by discerning a national consensus on the issue or through some other mode of analysis, that a form of murder as defined by a state, when committed by one with a sufficient degree of participation and without a characteristic deemed to limit culpability as a matter of law was, per se, insufficiently aggravated to permit imposition of the death penalty under the Eighth Amendment. In the absence of further guidance from the high court, we will not invalidate concealment-of-purpose lying in wait as a special circumstance rendering a defendant eligible for the death penalty.

Defendant contends that imposition of the death penalty based on a sole lying-in-wait special circumstance is disproportionate for another reason: Although lying-in-wait murder is equivalent to intentional murder, not every intentional murder is deserving of the death penalty. Thus, in his view, "[t]he appropriate question" is not simply whether he intentionally killed, but whether the lying-in-wait special circumstance, as construed by this court, meaningfully distinguishes between ordinary murder and capital murder in a way that overcomes what he asserts is California's outlier status in terms of national consensus. In other words, he contends, the federal and state Constitutions require there to be a qualitative moral difference between lying-in-wait murders and other murders rendering a person who kills by lying in wait deserving of execution. As defendant seems to acknowledge, however, this aspect of his argument is closely intertwined with the oft-rejected narrowing argument discussed above. We are unpersuaded the asserted breadth of the special circumstance renders it a disproportionate or unconstitutionally arbitrary punishment for the crimes to which it applies, either generally or in this case.

57

Defendant further contends that imposition of the death penalty based on the lying-in-wait special circumstance constitutes excessive punishment under the Eighth Amendment because it fails to "fulfill the two distinct social purposes served by the death penalty: retribution and deterrence." (*Kennedy*, *supra*, 554 U.S. at p. 441.) This aspect of his argument, in substance, merely reframes his contention that lying in wait as a death-eligibility criterion fails to draw a qualitative moral distinction with ordinary murder and must be rejected for the same reason. As the Attorney General observes, "[m]urder committed by lying in wait has been 'anciently regarded . . . as a particularly heinous and repugnant crime.' " (*People v. Edelbacher* (1989) 47 Cal.3d 983, 1023.)

### 6. *Constitutionality of the death penalty law*

Finally, defendant challenges the constitutionality of many aspects of California's death penalty law and related instructions under the Fifth, Sixth, Eighth, and Fourteenth Amendments to the federal Constitution. He acknowledges that our prior decisions have rejected each of his challenges, but asks that we reconsider our holdings. He fails to persuade us to do so. Thus:

Section 190.2 does not fail to meaningfully narrow the pool of murderers eligible for the death penalty. (*People v. Bennett* (2009) 45 Cal.4th 577, 630; *People v. Stanley* (1995) 10 Cal.4th 764, 842–843.)

Permitting the penalty phase jury to consider the "circumstances of the crime" within the meaning of section 190.3 does not result in the arbitrary and capricious imposition of the death penalty. (*People v. Kennedy* (2005) 36 Cal.4th 595, 641.)

The death penalty law is not unconstitutional in failing to require the jury to find beyond a reasonable doubt that death is the appropriate penalty. (*People v. Gonzales and Solis* (2011) 52 Cal.4th 254, 333 [rejecting argument that *Blakely v.*

*Washington* (2004) 542 U.S. 296, *Ring v. Arizona* (2002) 536 U.S. 584, and *Apprendi v. New Jersey* (2000) 530 U.S. 466, apply to Cal. capital penalty phase proceedings]; *People v. Prieto* (2003) 30 Cal.4th 226, 262–263; *People v. Blair* (2005) 36 Cal.4th 686, 753 [neither due process clause nor 8th Amend. requires the jury be instructed it must decide beyond a reasonable doubt that aggravating factors outweigh mitigating factors].)

The Sixth, Eighth, and Fourteenth Amendments do not require that the jury be instructed the state has the burden of proof or persuasion regarding the existence of any factor in aggravation, whether aggravating circumstances outweigh mitigating factors, and the appropriateness of the death penalty (or that there is no burden), or that life imprisonment without parole is presumed to be the appropriate sentence. (*People v. Loy* (2011) 52 Cal.4th 46, 78–79; *Romero*, *supra*, 44 Cal.4th at p. 429.) As defendant recognizes, we have held that capital sentencing is unlike other sentencing in that it is largely moral and normative, and thus not susceptible to burdens of proof or persuasion, and that a capital defendant is not entitled to an instruction that life is presumed to be the appropriate penalty. (*People v. Lenart* (2004) 32 Cal.4th 1107, 1136–1137; *People v. Arias* (1996) 13 Cal.4th 92, 190.) We reaffirm these decisions.

We likewise adhere to our view that jury unanimity with respect to aggravating factors, including that of unadjudicated criminal activity, is not required. (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 458; *People v. Lucas* (2014) 60 Cal.4th 153, 333.) The use of the term "so substantial" in CALJIC No. 8.88 is not unconstitutionally vague under the Eighth and Fourteenth Amendments. (*People v. Lopez* (2013) 56 Cal.4th 1028, 1083.) The jury need not be instructed the central determination in the penalty phase is whether death is the appropriate punishment. (*People v. Valdez* (2012) 55 Cal.4th 82, 179.) Because the jury was instructed it could impose a death sentence only if

it found that aggravating factors outweighed mitigating factors, the converse instruction—that it should impose a life sentence if it found mitigation outweighed aggravation—was unnecessary. (*People v. Capistrano* (2014) 59 Cal.4th 830, 882.) The jury need not be instructed unanimity is not required as to mitigating factors. (*People v. Rogers* (2013) 57 Cal.4th 296, 349; cf. *Kansas v. Carr* (Jan. 20, 2016, Nos. 14–449, 14–450, 14–452) ___ U.S. ___, ___ [2016 U.S. Lexis 845, *18] [trial court need not instruct that mitigating evidence need not be proved beyond a reasonable doubt].)

The lack of a requirement of written jury findings does not violate a capital defendant's right to meaningful appellate review. (*People v. Russell* (2010) 50 Cal.4th 1228, 1274.) The use of restrictive "adjectives such as 'extreme' (§ 190.3, factors (d), (g)) and 'substantial' (*id.*, factor (g))" in the list of mitigating factors did not act as a barrier to the jury's consideration of mitigation. (*People v. Valdez*, *supra*, 55 Cal.4th at p. 180.) "The trial court need not delete factually inapplicable sentencing factors from the instructions." (*Ibid.*) Nor need the trial court instruct the jury that statutory mitigating factors are relevant solely as potential mitigators. (*Hillhouse*, *supra*, 27 Cal.4th at p. 509.)

Intercase proportionality review is not constitutionally required. (*People v. Merriman* (2014) 60 Cal.4th 1, 106.) California's death penalty law does not violate equal protection principles notwithstanding that noncapital defendants are entitled to certain procedural protections, such as the requirement the sentencer provide written reasons justifying the sentence, that are not available to capital defendants. (*People v. Banks* (2014) 59 Cal.4th 1113, 1208.) California's use of the death penalty does not violate international law, the Eighth or Fourteenth Amendment, or "evolving standards of decency." (*People v. Suff* (2014) 58 Cal.4th 1013, 1079; see *People v. DeHoyos* (2013) 57 Cal.4th 79, 151.)

60

## III. DISPOSITION

The judgment is affirmed.

**WERDEGAR, J.**


**WE CONCUR:**


**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**CORRIGAN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** People v. Casares

_____

**Unpublished Opinion**
**Original Appeal** XXX
**Original Proceeding**
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S025748
**Date Filed:** February 4, 2016

_____

**Court:** Superior
**County:** Tulare
**Judge:** David L. Allen

_____

**Counsel:**

Michael J. Hersek, State Public Defender, under appointment by the Supreme Court, Kathleen M. Scheidel, Assistant State Public Defender, and Elias Batchelder, Deputy State Public Defender, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Ward A. Campbell, Michael A. Canzoneri and David A. Lowe, Deputy Attorneys General, for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Kathleen M. Scheidel
Assistant State Public Defender
1111 Broadway, 10th Floor
Oakland, CA  94607-4139
(510) 267-3300

David A. Lowe
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA  94244-2550
(916) 322-5682