Filed 6/30/22  P. v. R.E. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| THE PEOPLE,<br><br>     Plaintiff and Respondent,<br><br>     v.<br><br>R.E.,<br><br>     Defendant and Appellant. | B310841<br><br>(Los Angeles County<br>Super. Ct. No. PJ53438) |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Morton Rochman, Judge.  Affirmed as modified.

Torres & Torres and Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Senior Assistant Attorney General, Scott A. Taryle, Supervising Deputy Attorney General, Colleen M. Tiedemann, Deputy Attorney General, for Plaintiff and Respondent.

_____

In a petition filed to declare juvenile R.E. a ward of the court under Welfare and Institutions Code section 602, it was alleged that R.E. committed two counts of rape of an intoxicated person.  The juvenile court declared R.E. a ward of the court and found true the allegations.  The court ordered commitment to the Department of Juvenile Justice (DJJ) for a term not to exceed 10 years.

On appeal, R.E. contends: (1) there is insufficient evidence to support the juvenile court's finding that he raped one of the two victims, (2) the court abused its discretion by committing him to the DJJ, and (3) R.E.'s term of commitment must be reduced to no greater than eight years pursuant to Senate Bill No. 823 (Stats. 2020, ch. 337, § 28) (Senate Bill 823), which applies to his case retroactively.  R.E. requests that this court remand the matter for a new dispositional hearing to afford him the opportunity to present evidence of his behavior during commitment and to permit him to argue for a less serious allegation under Los Angeles District Attorney Special Directive 20-09.

The People agree that Senate Bill 823 applies to R.E.'s case, and that his term of commitment must be reduced.  The People argue that this court should reduce the commitment term to the maximum of eight years.  Remand is not necessary, as the juvenile court imposed the maximum term of commitment.  The People dispute R.E.'s other contentions.

We modify R.E.'s maximum term of commitment to eight years, but otherwise affirm the judgment and order.

2

**FACTS**

*Prosecution*

### The Incident

K.A. testified that, on October 7, 2019, she and her friend J.G. took a bus to Ralphs with J.C. and J.B. K.A. had ingested two beers before she boarded the bus. The group met up with R.E. and went to the rooftop of a building in North Hollywood, where they drank alcohol together. They intended to get drunk and then go home. K.A. drank five mouthfuls of alcohol and felt "very tipsy." She had never been so drunk. K.A. remembered talking, J.G. and J.C. dancing, and music playing on her phone. She remembered J.G., who was also intoxicated, kissing J.C. and J.B. K.A. passed out. When she regained consciousness, she was lying on the ground and her whole body hurt. She thought she fell over. R.E. took a video of K.A. while she was on the ground. Someone shook her and tried to wake her up, but she remembered nothing after that. K.A. did not consent to any sexual contact or kissing with R.E., J.C., or J.B. while they were on the roof.

K.A. woke up in a hospital but she did not know how she got there. The police took her to the Center for Assault Treatment Services (CATS) where she spoke to a detective and was examined by a nurse. During the examination, the nurse photographed K.A.'s body and swabbed her vagina and mouth. The exam revealed facial injuries and an abrasion on her right breast. A vaginal exam revealed bruising around the urethra and petechia at the entrance of the vagina, which was indicative

3

of penetration. At the hearing on the petition, K.A. denied having been sexually assaulted.

J.G. testified that, on October 7, 2019, she went to a park with K.A., J.C., and J.B. She drank three beers and was feeling "tipsy." They met up with R.E. and went to Ralph's grocery store, where they purchased two bottles of alcohol. The group then went to the rooftop of an apartment building. J.G. drank two large gulps of alcohol and felt very drunk. She remembered music playing, talking, and dancing. J.C. came up behind her and grabbed her waist, but she blacked out after that. J.G. did not consent to having sex with anyone that night.

J.G. woke up in the hospital. She had pain inside her vagina and was bleeding. She was taken to CATS in a police car, where she spoke to a detective and was examined by a nurse. The nurse photographed her entire body, including her vagina. The nurse swabbed her vagina, legs, mouth, and face. J.G.'s arms, chest, and back were bruised. She also had abrasions on her back. A vaginal exam revealed a hymenal transection, bruising, and a small oozing cut.

That day J.G. viewed a video on R.E.'s Instagram page in which she was lying on the ground with J.C. on top of her.

Melinda Gross testified that on the evening of October 7, 2019, she went to the rooftop area of her building to smoke a cigarette. She saw three or four men and a woman who seemed very intoxicated and appeared to be passed out. The men were passing alcohol around. Gross was concerned about the woman and asked if everything was okay. One of the men responded that everything was fine. Gross went downstairs but soon returned because she was worried. The atmosphere seemed like a "ruckus party," with a lot of cheering and jesting. Gross heard

4

the woman making a "howling moan" and saying, "I don't want to." Gross went downstairs and called 911. Police responded within five minutes.

### The Investigation

Los Angeles Police Department Officer Elizabeth Cairns and other officers responded to the call of a possible rape in progress. When Officer Cairns reached the rooftop of the building, J.G. was lying on the ground with her shirt and bra pulled up to her neck. Her pants were down by her ankles and her underwear was pulled to the side. J.G.'s pants were wet with what appeared to be urine. She was unconscious and unresponsive. R.E. was on top of her. Officer Cairns ordered R.E. to stand and put his hands in the air. R.E. initially tried to put his erect penis back inside his pants. J.C. and J.B. were near K.A. K.A.'s pants were also wet with urine. Her bra and shirt were pulled up above her breasts and her zipper was down. She had what appeared to be gravel on her clothing. Officers detained R.E., J.C., and J.B. K.A. and J.G. were transported to the hospital by ambulance. Officers recovered a condom, a bottle of Jose Cuervo tequila, and a Bombay gin bottle cap from the rooftop.

R.E.'s DNA was found on swabs of J.G.'s vagina, perianal area, external genital area, and perioral area, as well as on the inside and outside of the condom. J.G.'s DNA was also found on the outside of the condom. A combination of DNA from R.E., J.C., J.G. and K.A. was found on a swab of R.E.'s penile shaft. A combination of DNA from J.B., J.G. and K.A. was found on swabs of J.B.'s glans penis, penile shaft, and scrotum. A combination of

DNA from J.C. and J.G. was found on swabs of J.C.'s glans penis and penile shaft. Male DNA was detected on K.A.'s neck. Male DNA was not detected on swabs of K.A.'s vaginal, cervical, perianal, and external genital areas. The use of a condom could prevent the transfer of DNA to those areas. With respect to J.C.'s DNA on R.E.'s penile shaft, it was possible that J.C. had sex with someone and left DNA, and then R.E. had sex with the same person and picked up J.C.'s DNA.

Detective John Perez obtained a video from J.B.'s Instagram account. The video was from R.E. and showed J.B. on top of J.G. They were both clothed and someone was making comments. The video was also recovered from R.E.'s phone, which indicated that it had been forwarded to others. Five additional videos were subsequently recovered from J.B.'s phone. J.G. was in some of the videos with her breasts and buttocks exposed. Another video showed K.A., who was unresponsive, with her breast exposed and a male hand digitally penetrating her vagina.

*Defense*

R.E.'s mother Sonia Montiel testified that R.E. suffered neurological damage and a seizure disorder following an emergency c-section delivery. He was in special education classes at school and participated in therapy. R.E. suffered from cognitive disabilities, including: Tourette's syndrome, anxiety attacks, anxiety, attention deficit disorder, attention deficit hyperactivity disorder, and post-traumatic stress disorder. R.E. also had a heart condition.

Dr. Mehul Anjaria, an expert in the field of forensic DNA analysis, testified that the amount of K.A.'s DNA found on the swab of R.E.'s penile shaft was very small. The presence of K.A.'s DNA on R.E.'s penis did not mean there was sexual contact. Because K.A.'s DNA was found on both of R.E.'s hands, it was possible that R.E. transferred the DNA to his penis by touching it.

On cross-examination, Dr. Anjaria acknowledged that the presence of K.A.'s DNA on both R.E.'s and J.B.'s penile shafts could be indicative of sexual contact. He also acknowledged that the low level of K.A.'s DNA on R.E.'s penile shaft could be explained by the use of a condom.

## DISCUSSION

### *Substantial Evidence Supports the Finding That R.E. Raped K.A.*

The standard for determining the sufficiency of the evidence supporting a juvenile wardship adjudication is the same as that for a criminal conviction. (*In re Matthew A.* (2008) 165 Cal.App.4th 537, 540.) When reviewing for sufficiency of the evidence, we consider "'"'the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence which is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.'"' [Citation.]" (*People v. Casares* (2016) 62 Cal.4th 808, 823 (*Casares*), disapproved of on another ground in *People v. Dalton* (2019) 7 Cal.5th 166, 214; *People v. Clark* (2011) 52 Cal.4th 856,

942–943.) "'The standard of appellate review is the same in cases in which the People rely primarily on circumstantial evidence.' (*People v. Bean* (1988) 46 Cal.3d 919, 932.) '. . . [I]t is the [finder of fact] rather than the reviewing court that weighs the evidence, resolves conflicting inferences and determines whether the People have established guilt beyond a reasonable doubt.' (*People v. Yeoman* (2003) 31 Cal.4th 93, 128.)" (*Casares*, *supra*, 62 Cal.4th at p. 823.) "Thus, if the verdict is supported by substantial evidence, we must accord due deference to the trier of fact and not substitute our evaluation of a witness's credibility for that of the fact finder." (*People v. Jones* (1990) 51 Cal.3d 294, 314.)

R.E. argues that this court should draw different inferences from the facts than the juvenile court did, and weigh the evidence in a contrary manner. We will not reverse the juvenile court's true finding simply because there is more than one possible view of the facts. We give deference to the juvenile court's findings of fact. Here, the evidence revealed that R.E. had K.A.'s DNA on his penile shaft. A nurse who examined K.A. concluded that K.A. sustained injuries consistent with penetration. R.E.'s own expert conceded that the amount of K.A.'s DNA on R.E.'s penile shaft could be consistent with the use of a condom. Substantial evidence supports the juvenile court's finding.

### *Commitment to DJJ Was Not an Abuse of Discretion*

When exercising its discretion on the proper disposition of a minor adjudged to be a ward under section 602, the juvenile court considers a broad range of information. The record must be viewed in light of the purposes of juvenile law. (*In re Carlos J.*

(2018) 22 Cal.App.5th 1, 5.) Those purposes include rehabilitation, treatment, guidance, punishment as a rehabilitative tool, and protection of the public. (*In re Teofilio A.* (1989) 210 Cal.App.3d 571, 576 (*Teofilio A.*).) The court considers the probation officer's report and any other relevant and material evidence that may be offered, including statements by the victim and the victim's parents. (Welf. & Inst. Code, § 706.) The court must take into account the circumstances and gravity of the offense committed by the minor, as well as the minor's age and previous delinquency history. (Welf. & Inst. Code, § 725.5.) The court may also consider the need to hold the minor accountable for his or her actions. (Welf. & Inst. Code, § 202, subd. (b); *In re N.C.* (2019) 39 Cal.App.5th 81, 89 (*N.C.*) [court properly considered "the role punishment should have in minor's rehabilitation given the seriousness of his offense and his tendency to succumb to the negative influence of his peers"].)

"One of the primary objectives of juvenile court law is rehabilitation, and the statutory scheme contemplates a progressively more restrictive and punitive series of dispositions starting with home placement . . . and progressing to . . . placement at the DJJ." (*In re M.S.* (2009) 174 Cal.App.4th 1241, 1250 (*M.S.*); see also *N.C.*, *supra*, 39 Cal.App.5th at pp. 85–86.) "Although the DJJ is normally a placement of last resort, there is no absolute rule that a DJJ commitment cannot be ordered unless less restrictive placements have been attempted." (*M.S.*, *supra*, 174 Cal.App.4th at p. 1250.) Courts do not necessarily abuse their discretion in ordering a juvenile to the most restrictive placement before other options have been tried. (*In re Eddie M.* (2003) 31 Cal.4th 480, 507.) It is error, however, for the juvenile court to fail to consider less restrictive alternatives to a

9

DJJ commitment.  (*Teofilio A.*, *supra*, 210 Cal.App.3d at p. 577.)
Commitment to the most restrictive placement, such as DJJ, is
permissible so long as there is substantial evidence
demonstrating "a probable benefit to the minor from a DJJ
commitment and of the inappropriateness or ineffectiveness of
the proposed less restrictive alternatives." (*N.C.*, *supra*, 39
Cal.App.5th at p. 86 [affirming order committing first time
offending minor to a maximum of nine years in DJJ after minor
admitted one count of forcible oral copulation and one count of
sexual battery of an intoxicated 17 year old high school student];
*In re Angela M.* (2003) 111 Cal.App.4th 1392, 1396–1397 (*Angela
M.*).)

We review a commitment order for abuse of discretion, and
find an abuse of discretion when necessary factual findings are
not supported by substantial evidence.  (*In re Miguel C.* (2021) 69
Cal.App.5th 899, 908 (*Miguel C.*).)  In our review of the appellate
record, we draw all reasonable inferences in favor of the juvenile
court's order.  (*Angela M.*, *supra*, 111 Cal.App.4th at p. 1396.)
"[W]e consider whether substantial evidence supports the
juvenile court's commitment order consistent with the purpose of
the juvenile court law.  [Citations.]  Substantial evidence, in turn,
'must be reasonable in nature, credible, and of solid value; it
must actually be "substantial" proof of the essentials which the
law requires in a particular case.' [Citation.]" (*Miguel C.*, *supra,*
at p. 908.)

**Proceedings**

In a disposition hearing on November 20, 2020, R.E.'s
counsel argued that R.E. should be placed in a live-in substance

10

abuse program with 24-hour supervision. Counsel had registered R.E. for an appropriate program in the event that the court agreed. Counsel argued that R.E. was heavily intoxicated during the incident and made a huge mistake that he deeply regretted. R.E. had a severe substance abuse problem, as well as mental health issues, and special education needs. Counsel argued that R.E.'s friends asked him to join at the last minute to go drinking; he did not plan to commit rape. R.E. had already been at juvenile hall for 14 months at the time of the hearing. In juvenile hall, R.E. had exhibited exemplary behavior and taken classes to address his problems. Counsel explained that R.E. was 14 years old at the time of the prior robbery in his record. He was at a mall and some kids were pouring ice cream over a ledge. R.E. took out a pellet gun and demanded the ice cream to get the kids to stop.

R.E.'s mother made a statement on his behalf. She was a 42-year-old single working mother who had watched her son struggle and fall into alcoholism after being abandoned by his father. R.E.'s mother came to the hearing alone. Her ex-husband refused to participate in the hearing and provide support. R.E.'s mother was a rape victim herself, and her mother was raped by 14 men and left for dead. She understood the pain of the situation. R.E. had grown following the incident, understood the gravity of what occurred, and was taking responsibility. R.E.'s mother reported that K.A. had called R.E.'s sister. K.A. was crying and told R.E.'s sister that it was not fair that he was being charged with her rape as well as J.G.'s.

R.E.'s grandmother also made a statement. She was unable to work and stayed at home all day. She helped raise R.E. He was in special education and had a psychologist. He had

problems in school and suffered from anxiety. His teachers worked with him one-on-one, but he was behind in his lessons. The teachers had to put a blanket on his shoulders to calm him down and ease his anxiety. R.E. was not the kind of person who would be involved in this type of incident. He was compassionate.

The court stated that that morning it had been informed of Senate Bill 823, which realigned responsibility for youthful offenders to counties, most significantly by closing DJJ and establishing the Office of Youth and Community Restoration. The court had been advised that DJJ would close intake on July 1, 2021.

The prosecutor confirmed this information. She recommended commitment on the basis of the maximum confinement time. During the incident R.E. had shown no compassion for the victims. His behavior was despicable. He raped one of his best friends. He participated in the video recording. His demeanor in the recording showed that he viewed the incident as a "fun party. He was having a great time with his friends." This was particularly disturbing given that his grandmother had been the victim of a horrific rape. The fact that his grandmother's experience did not prevent him from participating in the rapes was especially concerning. R.E. had to make many choices for that day to culminate as it did. He had many opportunities to stop but chose not to. He took the time to use a condom. The evidence showed that he raped J.G. twice. Although R.E.'s psychologist's report stated that he was uninterested in sex, he had brought a condom with him. R.E. had attempted rehabilitation previously without success. The case was sealed three or four months prior to the current incident.

12

R.E. had just completed probation. The prior probation reports showed that R.E.'s mother worked hard to obtain the services he needed, but as soon as his probationary period ended, R.E. resumed drinking and committed rape. Rehabilitation did not work for him. His pattern of behavior displayed "unrelenting, violent criminal conduct." In his letter to the court, R.E. continued to deny any memory of the rapes, despite being awake, alert, and coherent when the police interviewed him just after his arrest. In his letter to the court, he blamed his conduct on alcohol and continued to take no responsibility. He did not acknowledge the horror of his crimes or the victims' suffering. The victims could not consent; he took advantage of them. He enjoyed himself despite knowing the damage that he would cause the victims.

The prosecutor requested that R.E. be committed to DJJ. Because R.E. was over the age of 18, he was no longer eligible for suitable placements or camp. The court's only options were to send him home on probation or commit him to DJJ. Home on probation was not sufficient to deter him and not proportional to the criminal conduct involved. The only way R.E. could be sufficiently rehabilitated was by entering a long-term treatment facility where he could receive substance abuse and sex offender counseling and have regular access to medical staff who could address his mental health issues.

R.E.'s counsel reiterated that R.E., J.G., and K.A. were all very intoxicated, so it was not surprising that none of them remembered the details of the incident. R.E. had already experienced the significant consequence of confinement to juvenile hall for 14 months, and had displayed exemplary behavior. Counsel was concerned regarding the status of DJJ.

13

Counsel argued that J.B. was in suitable placement, although he was more culpable.[1]  R.E.'s mother had been proactive about getting him into the programs he needed.  R.E. was now on medication and had been sober for 14 months.  Counsel again advocated for a live-in closed program where R.E. could be supervised and participate in the programming that he needed.

The court observed that the probation officer's report recommended against returning to the community due to R.E.'s demonstrated pattern of victimizing innocent people.  R.E. showed no restraint while intoxicated and victimized people who were intoxicated and unconscious, which was very dangerous.  R.E. was age-appropriate for DJJ and would benefit from its sex offender program.  Although less restrictive dispositional options were considered, the probation officer's report concluded that continuance in the home would be contrary to R.E.'s welfare.  Community safety, victim safety, and the safety of R.E. while he worked toward positive behavioral changes favored removal from the home and extensive treatment.  The court stated that it agreed with the prosecution and the probation department.

The prosecutor stated that maximum confinement was 10 years, but she did not know how many custody credits R.E. had earned.  The court continued the hearing so that the appropriate paperwork could be completed and credits could be calculated.

---

[1] The court asked the prosecutor how J.B.'s case had been resolved.  The prosecutor explained that J.B. admitted his role before DNA evidence had been analyzed, and before all of the information about the incident had been discovered.  J.B. got suitable placement.  Afterwards, the investigating officer received a report that the video of the incident was in J.B.'s cell phone.  J.B. was charged with child pornography, and the charges were still pending.

14

At the continued hearing on January 7, 2021, the court ordered R.E. committed to DJJ.  In light of R.E.'s physical and mental conditions, the court found it was probable that R.E. would benefit from DJJ commitment.  R.E. had been declared a ward of the court under Welfare and Institutions section 707, subdivision (b) for violation of Penal Code section 261, subdivision (a)(3), a felony.  The court ordered the maximum commitment of 10 years.

### Analysis

The juvenile court did not abuse its discretion by committing R.E. to DJJ.  The court considered less restrictive alternatives.  R.E. had attempted rehabilitation in home placement in the past, but had returned to substance abuse and violent criminal behavior only months after completing probation.  R.E. had strong parental support, but had still not reformed despite his mother's efforts.  DJJ had age-appropriate programming responsive to R.E.'s needs that he was already participating in with success.  The court's concern for the safety of the victims and society in general was supported by substantial evidence.  The crimes R.E. committed were horrific and callous.  R.E. understood the impact of rape, which both his mother and grandmother had suffered, yet he committed the crimes without concern.  R.E. had betrayed his friends and victimized them when they were unconscious and unable to consent.  He recorded the crimes, distributed the recordings to the other perpetrators, and published at least one video on social media.  His demeanor demonstrated that it was all fun for him. R.E. did not take responsibility for his actions.  Commitment to

DJJ was not an abuse of discretion in light of the severity of the crimes, R.E.'s prior unsuccessful attempt at rehabilitation in home placement, and the availability of DJJ programming that addressed R.E. problems in an age-appropriate setting.

*Senate Bill No. 823*

R.E. contends that under recently enacted Senate Bill No. 823, which he argues should be applied retroactively to his case, the maximum period of confinement should be reduced to eight years. The Attorney General concedes that retroactive application of the law is appropriate and a reduction in R.E.'s commitment is warranted. The parties disagree regarding whether this court should modify the order of confinement or remand to the juvenile court for a new dispositional hearing. We modify the period of commitment to eight years.

On September 30, 2020, the Governor approved Senate Bill No. 823 and its provisions went into effect. Senate Bill No. 823 amended Welfare and Institutions Code, section 731, former subdivision (c). (See Welf. & Inst. Code, former § 731, subd. (c).) The amended section limited the maximum term of confinement of a minor to the Department of Corrections, Division of Juvenile Justice to "the middle term of imprisonment that could be imposed upon an adult convicted of the same offense." (Stats. 2020, ch. 337, § 28, eff. Sept. 30, 2020.) Senate Bill No. 823 became operative on September 30, 2020, and inoperative on July 1, 2021. (See former Welf. & Inst. Code, § 731, subd. (d) ["This section shall become inoperative on July 1, 2021, and, as of January 1, 2022, is repealed"].) Senate Bill No. 823 now applies the same limitation on the maximum confinement period to all

16

juvenile commitments as of July 1, 2021, by amending Welfare and Institutions Code section 730, subdivision (a)(2), to provide: "A court shall not commit a juvenile to any juvenile facility for a period that exceeds the middle term of imprisonment that could be imposed upon an adult convicted of the same offense." (Stats. 2020, ch. 337, § 27.)

We agree with the parties that Senate Bill No. 823 applies to R.E.'s case. Under *In re Estrada* (1965) 63 Cal.2d 740 (*Estrada*), "we presume that newly enacted legislation mitigating criminal punishment reflects a determination that the 'former penalty was too severe' and that the ameliorative changes are intended to 'apply to every case to which it constitutionally could apply,' which would include those 'acts committed before its passage[,] provided the judgment convicting the defendant of the act is not final.' (*Estrada*, *supra*, 63 Cal.2d at p. 745.) The *Estrada* rule rests on the presumption that, in the absence of a savings clause providing only prospective relief or other clear intention concerning any retroactive effect, 'a legislative body ordinarily intends for ameliorative changes to the criminal law to extend as broadly as possible, distinguishing only as necessary between sentences that are final and sentences that are not.' [Citation.] 'The rule in *Estrada* has been applied to statutes governing penalty enhancements, as well as to statutes governing substantive offenses.' [Citations.]" (*People v. Buycks* (2018) 5 Cal.5th 857, 881–882.)

Here, the statutory amendment at issue is an ameliorative change in the law, which reduces the maximum term of confinement for minors. The Legislature did not express any intent to limit retroactive application of Senate Bill No. 823. (Stats. 2020, ch. 337, § 28.) Thus, under *Estrada*, the definition

17

of maximum term of confinement now found in Welfare and Institutions Code section 730, subdivision (a)(2), should be applied to all cases not yet final.

In this case, the middle term for rape is six years.  (Pen. Code, § 264, subd. (a).)  Accordingly, R.E.'s maximum term of confinement under the amended statute is eight years (six years in one count plus two years for the second count [one-third of the middle term]).  Remand is not required to correct the error because the juvenile court imposed the longest possible maximum term of confinement.  (See *People v. Buycks, supra,* 5 Cal.5th at p. 896, fn. 15 [remand is not required for resentencing where the trial court imposes the maximum possible sentence].)

## DISPOSITION

The juvenile court's order is modified to reflect a maximum term of confinement of eight years, and the judgment is affirmed as modified. The juvenile court is directed to prepare an amended disposition order consistent with our modification and forward the amended order to the appropriate authorities.

MOOR, J.

We concur:

BAKER, Acting P. J.

KIM, J.